**In re Eddie F. ARMSTRONG and wife Rebecca R. Armstrong, Debtors.**

**Bankruptcy No. 87–30388.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

March 14, 1988.

Roger N. Havekost, Johnson & Havekost, El Paso, Tex., for debtors.

Nelson Smith, Diamond, Rash, Leslie & Smith, El Paso, Tex., for movant.

## OPINION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

REMCO El Paso ("REMCO"), a furniture and appliance leasing and sales company has moved to compel assumption or rejection of its lease in this Chapter 13 case. Debtor responds by stating that the agreement in question is not a lease at all but a conditional sales contract. The chapter 13 plan proposes to cure the arrearages due over the life of the plan. The lease contains two specific clauses which the Court finds determinative of the case. First of all, the lease (or, more properly, rental) is from month to month. That is, the debtor can terminate the agreement simply by ceasing payments. It has the obligation to return the equipment (in this case, appliances) immediately, but owes nothing more to REMCO. In effect, the clause permits the debtor to terminate the contract at will at any time.[1] The second clause in question permits the debtor to "renew" the lease by the mere expedient of paying the next month's rental (there is no grace peri-

---

1. The clauses in question are reproduced here as they appear in the agreement itself:

**RENTAL–PURCHASE AGREEMENT**

This agreement entitles me to use Remco's property only at the address above and until my paid rental period expires. Before the end of my paid rental period, my options are to:

1. Renew this agreement (See renewal option below) or
2. Buy the property (See cash purchase option below) or
3. Return the property (See return of property below.

**I AM NOT OBLIGATED TO RENEW THIS AGREEMENT OR TO BUY THE PROPERTY.** If I do not renew or buy the property on or before the due date, I will be liable for rent for each day I keep the property.

**TERMINATION BY RENTER:** I may terminate this agreement by not paying a rental payment when due or by giving Remco possession of the property. I am responsible for paying rent until the property is returned to Remco or until I own it.

od). The lease provides, in effect, for stipulated renewal options for a preset number of months, at the conclusion of which the debtor will be the owner of the property.[2]

Numerous decisions have recited the language of Section 1–201(37) of the Uniform Commercial Code to the effect that, if a lease contains an option to purchase for no or nominal consideration, then it is, as a matter of law, not a true lease but rather a security agreement. *See Woods–Tucker Leasing Corp. of Georgia v. Hutcheson–Ingram Develop. Corp.*, 626 F.2d 401, 412 (5th Cir.1980), *vacated on other grounds*, 642 F.2d 744 (5th Cir.1981); *Federal Sign and Signal Corporation v. Berry*, 601 S.W.2d 137 (Tex.App.—Austin 1980, no writ); *Tackett v. Mid–Continent Refrigerator Co.*, 579 S.W.2d 545 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.); *Davis Bros. v. Misco Leasing, Inc.*, 508 S.W.2d 908, 912 (Tex.Civ.App.—Amarillo 1974, no writ); *see also Peco, Inc. v. Hartbauer Tool & Die Co.*, 500 P.2d 708, 262 Ore. 573 (1972).

There is no doubt that the lease here in question contains such an option. That conclusion does not end the inquiry, however. In fact, before a court can even proceed to apply the time-honored "no or nominal consideration" test, it must first determine whether the agreement of the parties even creates an obligation that could be secured. Tex.Bus. & Comm.Code, § 1–201(37) (an agreement to constitute a security agreement must convey an interest in personal property "... which secures payment or performance of an obligation ..."); *see Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1142–43 (7th Cir. 1982); *Leasing Service Corp. v. Graham*, 646 F.Supp. 1410, 1417 (S.D.N.Y.1986); *Rattan v. Commercial Credit Co.*, 131 S.W.2d 399 (Tex.Civ.App.1939, writ ref'd); *In re Loop Hospital Partnership*, 35 B.R. 929, 931 (Bankr.N.D.Ill.1983); *In re Peacock*, 6 B.R. 922, 924 (Bankr.N.D.Tex. 1980).[3] As the Seventh Circuit correctly pointed out in *Marhoefer,*

> Clearly, where a lease is structured so that the lessee is contractually bound to pay rent over a set period of time at the conclusion of which he automatically or for only nominal consideration becomes the owner of the leased goods, the transaction is in substance a conditional sale and should be treated as such.... Here, however, Marhoefer was under no contractual obligation to pay rent until such time as the option to purchase the [equipment] for one dollar was to arise.

2. The clauses, as printed in the agreement, appear as follows:

**TITLE: Remco owns the property. I have no ownership rights until I buy the property or acquire ownership as stated below.**

**RIGHT TO REINSTATE:** If I miss a payment, I can reinstate by paying the payment and other charges due within seven (7) days of the date for weekly rental or within fifteen (15) days for monthly rental. If I return the property during the reinstatement period, I will have thirty (30) days from the date of return to reinstate, and Remco must provide the same property or substitute property of comparable quality and condition. If I do not reinstate and do not return the property within the reinstatement period, I lose all rights to reinstate.

**RENEWAL OPTION/RENTAL OWNERSHIP:** I may renew this agreement by paying Remco a monthly or weekly payment before my paid rental period expires. There is no grace period. If I rent for the number of rental periods stated above, Remco will transfer ownership of the property to me along with any unexpired manufacturer's warranty, if the warranty so allows. **CASH PURCHASE OPTION:** I can buy the property any time by paying Remco the lesser of the remaining rental payments or the current cash selling price. Remco will quote me that price any time I ask. If I do not purchase then, the price may change, but will never be more than the "Cash Selling Price" above.

3. *Peacock* lays out a three-tier analysis for evaluating whether a lease is in fact a security agreement. At the first tier, the court decides whether the agreement contains or creates an affirmative obligation to pay all the rental payments specified in the agreement. The second tier turns to the "no or nominal consideration" test. The court must reach an affirmative answer at the first tier before it can move to the next tier. A negative answer yields a finding that the agreement is a true lease. *In re Peacock*, 6 Bankr at 924–25. The analysis tends to lend predictability to lease transactions. *See In re Royer's Bakery, Inc.*, 1 U.C.C.Rep.Serv. 342, 346 (E.D.Pa.1963) ("Criteria of this sort are necessary in order that the commercial and financial community may fashion their transactions with reasonable assurance that the means employed will not be undone if and when such transactions reach the courts").

*Matter of Marhoefer Packing Co., Inc.,* 674 F.2d at 1142. The court went on to note that Section 1–201(37) "does not apply where the lessee has the right to terminate the lease before [the] option arises with no further obligation to continue paying rent [citations omitted]. For where the lessee has the right to terminate the transaction, it is not a conditional sale." *Id.* at 1143.[4]

The debtors in this case have no obligation to continue paying rent under this agreement. The lease is terminable at will, with no strings attached. There can be no security interest without an obligation to secure. The lease in question must therefore stand as a true lease.

The debtors forcefully argue in their brief that an affirmative obligation to make all the rental payments specified in the lease is raised by the economic realities associated with the transaction. In particular, they note that, in consumer transactions, entities such as REMCO do not normally pursue deficiencies in the event of default. From the purchaser's point of view, the debtors contend that the typical consumer will look at the rentals as payments and, the longer they keep the item, the less likely they will be to give up the "equity" they have built up in the equipment. The debtors add that the total of the lease payments approximates the purchase price over a period of time, and that the intention to purchase which can be inferred from the milieu in which such transactions take place raises an obligation *as a practical matter* if the consumer is to receive ownership of the items.

These arguments raise obvious parole evidence problems. *See In re Rover's Bakery, Inc., supra* at 345. Even were the court to sweep those problems aside, though, the arguments must fail in this case. The lease agreement is written expressly for consumers, in non-technical language. The paragraphs are clearly labeled and each paragraph deals only with the discrete issue for which it is labeled. One such paragraph clearly advises the consumer that he or she has the unbridled right to "call it quits" at any time without penalty, but that the equipment will have to be returned in that event. Another paragraph gives the consumer the option of purchasing the item by continuing to pay rentals for the period of time clearly specified at the top of the lease. In short, the lease on its face makes it clear to the typical consumer that, though he or she *may* purchase the equipment by keeping up the rentals, there is no *obligation* to continue to make those payments.

Nor do the economic incentives in this case appear to compel purchase of the equipment. *Cf. In re Reserves Development Corp.,* 32 B.R. 46, 48 (Bankr.W.D. Mo.1983) ("the evidence shows that this equipment weighs 20 tons and is used to press liquid from coal. It is of no particular value for only 60 days of use [the term of the lease]. From an economic point of view the agreement is designed to compel lessee to purchase.... the lease device was used to avoid problems of repossession if the sale fell through"). No doubt the lease was structured by REMCO in part "to avoid problems of repossession" just as in *Reserves Development.* Also, the economics of so-called "rent-to-own" transactions encourage purchase. With a clearly indicated right to terminate at any time, however, the typical consumer could hardly be said to be *compelled* to purchase the items. Were the document obfuscatory and the surrounding circumstances strongly suggestive of a sale, then perhaps the economics of the situation might compel a finding that an affirmative obligation to purchase had in fact been created, thereby satisfying the first tier inquiry of *Peacock. See Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 892 (S.D.Ohio 1983).[5]

---

4. Cases which make no mention of this "first step" on their way to deciding the § 1–201(37) question nonetheless presume this prelude, as they must in order to compare the consideration paid under the lease with what the "lessee" would be paying were the transaction a conditional sales contract. *See, e.g., Federal Sign and*

*Signal Corp. v. Berry,* 601 S.W.2d 137, 140 (Tex. App.—Austin 1980, no writ) (compares lease payments made *over the life of the lease* to purchase price plus interest for the same term in order to apply UCC § 1–201(37) test).

5. Were the document drafted in a more obfuscatory fashion, it would probably be appropriate

That is not the case here, however. The agreement is clear and easy to understand, and gives no cause for upsetting the legitimate business expectations of the creditor who carefully drafted it to comply with applicable statutes and case law. In any event, the clearly indicated right to terminate at will is salutary from the debtor's standpoint as well. Consider for example how band instruments are acquired by parents for their children on similar "rent-to-own" contracts. The child might well excel at the instrument, justifying its purchase, but suppose the child turns out to have a tin ear for music?

For the foregoing reasons, the Court concludes that the REMCO rental agreement the subject of the Motion to Compel Assumption or Rejection is in fact a true lease and not a lease intended as a security agreement to secure the purchase of the items therein listed. The debtors have until April 30, 1988 to either assume or reject the lease contract. If the contract is rejected, the debtors are directed to cooperate in the return of the items to REMCO. The stay is modified to permit REMCO to pursue its remedies at law in the event the debtors fail to comply with the terms of this Order.

So ORDERED.

to more closely examine the surrounding circumstances to see whether a *de facto* debt obligation had been created. The bargaining position which the lessor enjoys in typical "rent-to-own" consumer transactions may require a higher degree of scrutiny and a certain solicitude for the consumer on the part of the court, justifying an investigation of the circumstances surrounding the transaction when the written agreement is obfuscatory. *See* 1 U.L.A. (UCC) § 1–201(10) (1976) ("a term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it"); 1 U.L.A. (UCC) § 2–202 (1976) ("Terms ... which are ... set forth in a writing intended by the parties as a final expression of their agreement ... may be explained or supplemented by course of dealing or usage of trade or by course of performance"); *see also Smith v. ABC Rental Systems of New Orleans, Inc.,* 491 F.Supp. 127, 129 (E.D.La.1978), *aff'd,* 618 F.2d 397 (5th Cir.1980); *LeMay v. Stroman's Inc.,* 510 F.Supp. 921, 923 (E.D.Ark.1981); *cf.* Consumer Lease Protection Act, *codified at* 15 U.S.C. §§ 1667a–1667e, 1640 (1976), Truth-in-Lending Act, *codified at* 15 U.S.C. §§ 1601 *et seq.* (1976).