# In re John C. and Yolanda E. AGUILAR, Debtors.

## Bankruptcy No. 87–53458.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

June 13, 1989.

Paul W. Rosenbaum, San Antonio, Tex., for debtors.

Gary W. Javore, Johnson & Christopher, San Antonio, Tex., for El Charro TV Rental.

### ORDER

LEIF M. CLARK, Bankruptcy Judge.

El Charro TV Rental filed a Complaint for Assumption or Rejection of Unexpired Lease, contending that its "rent-to-own" contract with the debtors is an executory contract as that term is used under Section 365.[1] The debtors responded that, under the authority of *In re Armstrong*, 84 B.R. 94 (Bankr.W.D.Tex.1988), this particular contract should not be treated as a true lease because (1) the option to purchase at a nominal value or no additional consideration should render the agreement a security agreement, and (2) the right to terminate does not in this case negate the existence of a real obligation to purchase the item in question.

In *Armstrong*, this Court held that, where a rent-to-own contract contained a clear and unequivocal right to "walk away" from the deal, absent equitable considerations not present in that case, the rental nature of the contract would be honored. That contract was held to be a true executory contract. *Armstrong*, 84 B.R. at 96–97. This case is distinguishable from *Armstrong* in a number of important respects. First of all, the cost to purchase the item in question is a moving target, decreasing with each additional payment. The contract provides that the purchase option is computed by taking "the total of weekly payments, less total of rental payments already paid, multiplied by 66 percent." The debtors thus are building equity in the item in question.[2] By contrast, in *In re Oerke*, 63 B.R. 1 (Bankr.N.D.Tex.1986), the purchase cost was unaffected by the number of payments to be received by the creditor. If the purchase price is less affected by market forces than it is by the payment scheme set out in the contract, it cannot be seriously argued that there is in fact any option to purchase whatsoever.

Furthermore, this precise feature of the contract undercuts the notion that the debtor has no obligation to continue making the payments and can "walk away" anytime he or she wants. In fact, the economic incentives for completing the payments set up under this contract are so complete that, as a practical matter, a debtor would not surrender the equipment in question for any reason whatsoever other than his or her inability to make the payments. The peculiar facts of this case buttress this conclusion. At the appliance rental store there are new and used items. The sales person "pushes" the new items to those persons who are interested in purchasing a TV or VCR, for example, but steers the customer to used items if all the customer really wants is to rent the equipment. The application form contained credit information and the sales person left the definite impression in the mind of the debtors in this case, that they were in fact buying, not renting, the television and VCR.[3] As the court in *Waldron v. Best TV and Stereo*

---

1. 11 U.S.C. § 365 (1982 & Supp. IV 1986).

2. Moreover, the court is persuaded by the reasoning in *In re Baker*, 91 B.R. 426 (Bankr.N.D. Ohio 1988), where the court found that because the debtors were obligated to pay sales tax and assume the risk of loss regarding the rental of a stereo/television and VCR under a purported rental agreement, such acts constituted a sale. The *Baker* court argued that a lessee would only pay sales tax if a sale were involved. *Id.* at 427. The debtors in the case at bar are required to pay sales tax and assume any risk of loss equal to the remaining payments. *See also In re Puckett*, 60 B.R. 223, 237 (Bankr.M.D.Tenn.1986), *aff'd* 838 F.2d 471 (6th Cir.1988) ("the obligation to pay taxes when borne by the consumer is an incident of ownership indicative of a secured transaction").

3. El Charro contends that its 85% return rate confirms that indeed its customers do understand that they are merely renting the equipment and most of them end up returning the equipment to the store. El Charro's contention is undercut by the fact that, as El Charro freely admits, rent-to-own is the "poor man's alternative to credit," making it possible for people of limited means with limited access to credit to buy a television they could not hope to purchase if they went to Sears or Montgomery Ward. Furthermore, the high return rate is just as indicative that the payments charged by operations such as El Charro are so exorbitantly high that most of its customers cannot afford to keep them up for the length of time specified in the rent-to-own contract. In other words, the high return rate represents a rate of default rather than a rate of return.

483

*Rentals, Inc.,* 485 F.Supp. 718, 719 (D.Md. 1979), commented, "despite the presence of the termination clauses, the agreement was essentially a contract for the credit sale of the TV set to plaintiff for a sum substantially greater than the cash value of the set." Again, the bankruptcy court for the Middle District of Tennessee noted that "the right to terminate has historical significance, but the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral." *In re Puckett,* 60 B.R. 223, 239 (Bankr.M.D. Tenn.1986), *aff'd* 838 F.2d 471 (6th Cir. 1988).

The equitable considerations that were absent in *Armstrong* are present here. Therefore, the Court finds that, unlike the Remco contract in *In re Armstrong,* the contract in this case *does* create an obligation sufficient to clear the first hurdle of *In re Peacock,* 6 B.R. 922 (Bankr.N.D.Tex. 1980).[4]

Having found that there is a cognizable obligation on the part of the lessee, to complete the payments under the contract, the court considers the remaining elements in the *Peacock* analysis to determine whether the purported rental agreement is a security agreement. If the agreement provides that upon compliance with the terms of the lease the lessee has the option to become owner of the property for no additional or nominal consideration, the court is compelled as a matter of law to find that the lease is intended as security. *Peacock,* 6 B.R. at 925 (citations omitted). The Court finds and concludes that the option to purchase for nominal or no value

found in this agreement as a matter of law converts this lease agreement into a purchase agreement.[5] Therefore, the Court finds that the contract in question should be treated for purposes of the bankruptcy as an installment purchase contract and not an as executory contract under Section 365 of the Bankruptcy Code. An Order consistent with this opinion will be entered accordingly.

**4.** The court in *Peacock* developed a three-tiered analysis for deducing whether the contract is a true lease or a disguised security agreement. The first tier of the analysis is mandated from section 1.201(37) of the Texas Business and Commerce Code which defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." Tex.Bus. & Comm.Code Ann. § 1.201(37) (Vernon Supp.1989). In determining whether a lease is in actuality a security, it is necessary to find an obligation on the part of the lessee that is to be secured. *Peacock,* 6 B.R. at 924. "A definite obligation to pay rentals

during the lease term totalling an amount substantially equivalent to the fair market value of the leased property plus a financing factor ... is a precondition to finding that the lease is intended as a security." *Id.*

**5.** The third tier of the analysis is not reached unless the option to purchase is for more than nominal consideration. The third tier relates to whether the lessor has effectively bargained away the absolute right to retake control of the leased property. *Peacock* at 925.