In re Billy Wayne SHELBY, Melissa
Williams Shelby, Debtors.

RENT–A–CENTER Movant,

v.

Billy Wayne SHELBY, Melissa
Williams Shelby, Debtors.

Bankruptcy No. 91–70160.

United States Bankruptcy Court,
N.D. Alabama, W.D.

March 28, 1991.

Nettie C. Blume, Tuscaloosa, Ala., for debtors.

Donna Smalley, Tuscaloosa, Ala., for movant.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter came before the court on Creditor and Movant, Rent–A–Center's Statement of Claim and Motion to Terminate the Section 362(a) Stay, as well as its Objection to Confirmation of the Shelbys' Chapter 13 plan. Rent–A–Center's motion and objection sought to have the court declare that a 78–week contract that conveyed possession of a color television to the debtors was an executory contract and did not create a security interest or constitute a credit sale. The court has heard the evidence at hearing, and reviewed the record in the context of applicable law. It is the judgment of the court that Rent–A–Center's motion is due to be DENIED and its objection to claim is due to be OVERRULED.

## FINDINGS OF FACT

On Saturday, January 12, 1991, Billy Wayne Shelby, who with his wife, is the debtor in this bankruptcy case, executed a written agreement with Rent–A–Center by which the Shelbys acquired possession of a used Zenith console color television (rental agreement filed with Claim No. 4 of Rent–A–Center).

The contract itself generally describes the transaction as a rental but provides that the Shelbys would own the television free and clear after paying $18.99 per week

for "78 successive weeks," without paying any additional purchase price. The agreement says that payments are due on Saturday of each week and purports to give Rent–A–Center the right to charge a "reinstatement fee" of $5.00 when payments are as much as two days late. The Shelbys made an initial payment of $29.38: $18.99 rental payment, $1.59 in tax and a $7.50 "processing charge."

The more pertinent parts of the written agreement provide the following:

3. *OWNERSHIP*

A. We own the property described herein. You do not own the property, and will not acquire any ownership rights therein unless you have, at your option, complied with the ownership terms of this agreement.

B. If you renew this agreement for *78* successive weeks, you will pay a total of *$1,481.22*, or if you renew this agreement for *N/A* successive months, you will pay a total of *$ N/A*, and will own the property.

Paragraph 2 gives further indication of the parameters of the relationship between Rent–A–Center and the Shelbys:

2. *OTHER CHARGES:* Reinstatement Fee. If you fail to make a rental payment by the due date, this Agreement automatically terminates, and we are entitled to return of the property; PROVIDED, *you may reinstate this Agreement, within two (2) days if you are renting the property on a weekly basis, or within five (5) days if you are renting on a monthly basis, by paying all missed rental renewal payments, plus a reinstatement fee of $5.00.* You must return the property to us during the reinstatement period if we ask you to do so. If you return the property as requested during the reinstatement period, you will have a right to reinstate, the Agreement for thirty (30) additional days, without losing any rights or options previously acquired under this Agreement. Upon reinstatement, we will provide you with the same property you are presently renting, or substitute property of comparable condition or quality.

Staffon White, Rent–A–Center account representative, told the court at a March 5, 1991 hearing that if the Shelbys had chosen to return the television they would have had no further obligation to his company beyond costs for the time it was in their possession. At the same hearing, Billy Wayne Shelby testified "it never was clarified" whether the television could be returned without further obligation in his January 12, 1991 transaction with White.

On Monday, January 14, or Tuesday, January 15, 1991 (following the Saturday the television was rented), Billy Wayne Shelby testified that he learned that the local law firm of Dishuck, LaCoste & Black, P.C., was initiating garnishment of his paycheck for an obligation to DCH Regional Medical Center. It was at that point, he testified March 5, 1991, that he consulted an attorney and decided to file a Chapter 13 petition. The attorney told him to bring her all his bills, Shelby said, so she could draft a Chapter 13 plan. He did, including the new obligation to Rent–A–Center. The Shelbys proposed to pay Rent–A–Center 100 percent of the obligation due under the contract, listing it as a secured creditor.

The Chapter 13 petition was filed January 22, 1991, with a hearing on the Shelbys' Chapter 13 plan originally set for March 1, 1991. The court that same day entered a deduction order against Billy Wayne Shelby's paycheck so payments could begin flowing into the Chapter 13 Trustee's Office. (DCH subsequently filed Claim No. 3 in this case for $767.16.)

At the point the Shelbys filed bankruptcy, Billy Wayne Shelby was employed at Sherman Utilities Structures in Tuscaloosa and reported net earnings of $210.00 weekly, according to the Chapter 13 statement in this case. The Shelbys have two sons: a six-month-old and a two-month-old. Billy Wayne Shelby listed his gross income for the last calendar year at $8,000–$9,000. Mrs. Shelby was not working.

Counsel for Rent–A–Center filed both an objection to the Shelbys' confirmation and a document entitled Statement of Claim and Motion to Terminate Section 362(a) stay on February 22, 1991. Both were

based on the contention that *Ala. Code* § *8-25-1 et seq.* controlled, making this transaction an executory contract, and that it was not a credit sale as defined in *Ala. Code* § *5-19-1(4).* Both documents said: "It is the contention of this listed creditor that the agreement which is the subject of this claim is in fact a rental agreement and not a credit sale." Documents filed by the creditor did not refer to *Ala. Code* § *7-1-201(37)* which defines "security interest" for secured credit transactions under Alabama's Uniform Commercial Code.

Rent–A–Center also filed Claim No. 4 on February 22, 1991. Writing in one blank of the claim form said: "This is a lease—rent-to-own—*with no* equity." and in another place on the form, "No title was transferred. This is a rental agreement—Attached." In the blank for the fair market value of the collateral, "$1,481.22" was written in. This is the exact obligation of the 78–week contract, if all payments were made. It seems doubtful this is an actual appraised value on the used television which is at issue. For the "Present Amount Due" on the form of $1,451.84 is computed by deducting the $29.38 payment the Shelbys had made from the $1,481.22 "Principal Amount" of the contract. Whatever the intent, the creditor listed the "Principal Amount" of the contract as the value of the used TV.

Because of Rent–A–Center's objection to confirmation, the Shelbys' confirmation hearing was continued until March 5, 1991. By the point the Shelbys came to court March 5, 1991, Billy Wayne Shelby had been laid off at Sherman Utilities and was looking for work. Melissa Williams Shelby, however, had gotten a job at the Sav-More Food Store in Tuscaloosa and payments to the Chapter 13 plan were proposed from her paycheck. (Records in the Chapter 13 Trustee's Office show a $24.00–per–week deduction order was entered on Mrs. Shelby's pay March 7, 1991.)

The court granted the oral petition of Rent–A–Center's counsel to expedite the case by waiving additional hearings on the creditor's motion to terminate stay. Creditor's counsel petitioned the court to decide all issues, based on the March 5, 1991 hearing on the creditor's objection to confirmation of the Shelbys' Chapter 13 plan. Creditor's counsel said legal and factual issues in the two proceedings were identical. Debtors' counsel consented to the procedural change on creditor's counsel's oral plea. The court granted the creditor's oral petition from the bench, March 5, 1991.

At that hearing, the court heard the testimony of White, for Rent–A–Center; and of Billy Wayne Shelby, the debtor; as well as arguments by counsel for both sides. Rent–A–Center's counsel argued that the agreement created an executory contract which should not be included in the debtors' Chapter 13 plan and that the subject of the agreement, the television, should not be protected by the automatic stay of Section 362(a). The Shelbys' counsel, on the other hand, contended the arrangement created a retail installment sale contract and that the debtors had the right to retain the television, paying the obligation through their plan. Billy Wayne Shelby testified the television was the only television in the family home. White testified the Shelbys made only the initial $29.38 payment and were approximately $106.00 in arrears by the March 5, 1991 hearing. Rent–A–Center offered no testimony on an appraised fair market value on the television.

After hearing the testimony at the March 5, 1991 hearing, the court from the bench confirmed the Shelbys' Chapter 13 plan including a $35.00–per–month payment to Rent–A–Center to retire the whole $1,451.84 contract balance, with payments by payroll deduction through the Chapter 13 Trustee's Office. The court also overruled Rent–A–Center's objection to confirmation and denied its motion, in reality a motion for relief from the automatic stay, to terminate stay from the bench on March 5, 1991.

March 6, 1991, the court executed the written confirmation order in the case, and the deduction order was issued to Mrs. Shelby's employer on March 7, 1991. On March 6, 1991, Rent–A–Center filed timely notice of appeal of the entry of the confirmation order. The interweaving of fact

and law that led to the court's decisions is set out below.

## CONCLUSIONS OF LAW

The legal crux of this case is whether factually this transaction creates a true rental executory contract or a U.C.C. Article 9 secured transaction in consumer goods. This is well-plowed ground in the United States Bankruptcy Court for the Northern District of Alabama.

This court has held repeatedly in conformity with Alabama law, affirmed by the United States District Court twice, that where a consumer may acquire personal property by fulfilling a rental agreement without paying more than a nominal additional purchase price, the transaction is a secured transaction under Alabama's version of the Uniform Commercial Code.[1]

 A creditor which has created a pre-petition secured transaction rather than a mere executory contract may not retrieve its collateral in bankruptcy without an order granting relief from stay from the Bankruptcy Court. To secure relief from stay, such creditors must meet the requirements for such as provided in 11 U.S.C. § 362(d).

## I.

## A RENTAL AGREEMENT WITH OPTION TO PURCHASE FOR NO ADDITIONAL COST CREATES A "SECURITY INTEREST" UNDER ALA. CODE § 7-1-201(37)

The Bankruptcy Code defines a security agreement as an "agreement that creates or provides a security interest" in 11 U.S.C. § 101(42). A "security interest" is a "lien created by an agreement" under 11 U.S.C. § 101(43) and a "lien" is defined as a "charge against or interest in property to secure payment of a debt or *performance of an obligation*" (emphasis added) by the terms of 11 U.S.C. § 101(31).

House and Senate reports on the applicable portions of the Bankruptcy Code make it plain that whether a transaction is a lease or a security interest "will depend on whether it constitutes a security interest under applicable state or local law."[2] The Alabama state law definition of a security interest and of the secured transaction that creates it will control this case.[3]

### A. *The plain language of the statute, interpreted by case law is dispositive*

The definition of "security interest" in *Ala. Code § 7-1-201(37)*, carried into Article 9 of Alabama's version of the Uniform Commercial Code by *Ala. Code §§ 7-9-102*[4]

---

**1.** *In re Melton,* 128 B.R. 820 (Bankr.N.D.Ala. 1989); *In re Brown,* 128 B.R. 815 (Bankr.N.D. Ala.1989); a consolidated decision, *Mattie Pearl Burton,* No. BK 87–00888, *Jacqueline Norwood,* Nellie Mary Ward, *Deletha Washington, Josephine Woods,* 128 B.R. 807 (Bankr.N.D.Ala.1989), *aff'd by Colortyme v. Burton et al.,* 128 B.R. 820 (N.D.Ala.1989); *In re Betty Jean Graham,* No. BK 85–3532 (Bankr.N.D.Ala. May 2, 1986, supplemented by May 16, 1986 Additional Findings of Fact and Conclusions of Law), *aff'd by In re Betty Jean Graham,* No. CV 86–H–1055-W (N.D. Ala. Sept. 11, 1986); *Lawson State Community College v. First Continental Leasing Corp.,* 529 So.2d 926 (Ala.1988) *overruled on other grounds, Berner v. Caldwell,* 543 So.2d 686 (Ala.1989) and *Commerce Union Bank v. John Deere Industrial Equipment Co.,* 387 So.2d 787 (Ala.1980).

**2.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–14 (1977) U.S.Code Cong. & Admin.News, 1978, pp. 5963, 6268, 6271; S.Rep. No. 989, 95th Cong. 2d Sess. 24–26 (1978) U.S.Code Cong. & Admin. News 1978, pp. 5787, 5809–5812.

**3.** *See In re Puckett,* 60 B.R. 223 (Bankr.M.D. Tenn.1986), *aff'd by In re Puckett,* 838 F.2d 471 (unpublished, text in WESTLAW) (6th Cir.1988); *In re Opelika Manufacturing Corp.,* 67 B.R. 169 (Bankr.N.D.Ill.1986) and *In re Pledger Roy Wood,* 7 B.R. 543 (Bankr.N.D.Ga.1980).

**4.** Section 7–9–102 provides:

**Policy and subject matter of this article.** (1) Except as otherwise provided in section 7–9–104 on excluded transactions, this article applies:

(a) To any transaction (*regardless of its form*) which is *intended to create* a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts and also

(b) To any sale of accounts or chattel paper.

(2) This article applies to security interests created by contract including pledge, assign-

*and 7–9–105(4),*[5] provides the critical language here. Section 7–1–201(37) defines a U.C.C. security interest as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 7–2–401) *is limited in effect to a reservation of a "security interest."* The term also includes any interest of a buyer of accounts or chattel paper which is subject to article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under section 7–2–401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with article 9. Unless a lease or a consignment is intended as security, reservation of title thereunder is not a "security interest," but a consignment is in any event subject to the provisions on consignment sales (section 7–2–326). *Whether a lease is intended as security is to be determined by the facts in each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.* (emnphasis added)

■ The official comment to *Ala. Code § 7–9–102* states very specifically: "When it is found that a security interest as defined in *Section 7–1–201(37) was intended,* this Article (Article 9 on secured transactions) applies *regardless of the form of the transaction or the name by which the*

parties may have christened it." Summing up: under Alabama statute, a rental transaction which allows the renter to own the property for no more or merely nominal consideration above fulfillment of the rental obligation is "intended for security" as a matter of law under *Ala. Code 7–1–201(37).* And if a transaction is "intended for security" under Section 7–1–201(37), it is a U.C.C. Article 9 secured transaction "regardless of its form," according to Section 7–9–102.

Nothing could be more unambiguous than this statutory framework. It makes a total lack of consideration or only nominal consideration required for ownership above the rental obligation a clear criteria for differentiating between a U.C.C. security interest and other interests created by contract.

*B. Alabama case law does not add additional requirements for distinguishing between a "true lease" and a disguised security interest to those set out in Section 7–1–201(37)*

*Commerce Union Bank v. John Deere Industrial Equipment Co.,* 387 So.2d 787 (Ala.1980) long ago set the standard of identifying the disguised security interest. That case cited with approval factors listed in often-quoted *In re Alpha Creamery Co., Inc.,* 4 U.C.C.Rep.Serv. 794, 797–98 (W.D. Mich.1967). They include the following:

1. The facts in each case control to show intention of the parties to create a security interest.

2. Reservation of title in a lease or option to purchase appurtenant to or included in the lease does not in and of itself make the lease a security agreement.

3. Lease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or *for no additional consideration is deemed*

---

ment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and *lease or consignment intended as security.* This article does not apply to statutory liens except as provided in section 7–9–310.

(3) The application of this article to a security interest in a secured obligation is not affected

by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply. (emphasis added)

5. Section 7–9–105(4) reads:

In addition, article 1 contains general definitions and principles of construction and interpretation applicable throughout this article. (U.C.C. Article 9 on secured transactions.)

> *intended a security agreement as a matter of law.*
>
> 4. The percentage that option purchase price bears to the list price, especially if it is less than 25%, is to be considered *as showing the intent of the parties to make a lease as security.*
>
> 5. Where the terms of the lease and option to purchase are such that *the only sensible course for the lessee at then end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.*
>
> 6. The *character* of a transaction as a *true lease* is indicated by:
>
> (a) Provision specifying *purchase option price which is approximately the market value* at the time of the exercise of the option.
>
> (b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.
>
> (c) Rentals which are not excessive and *option purchase price which is not too low.*
>
> (d) Facts showing that the lessee is acquiring no equity in leased article during the term of the lease.

*Commerce Union Bank* at 790 (citing *Alpha Creamery*) (emphasis added).

The *Commerce Union Bank* case involved heavy equipment used in an industrial context. The Alabama Supreme Court applied the *Alpha Creamery* factors and concluded that the business arrangement in question was a true lease. These guidelines for analyzing transactions do not dilute, they reinforce, the clear provision of *Ala.Code § 7–1–201(37)*'s subsection (b).

More recently *Lawson State Community College v. First Continental Leasing Corp.*, 529 So.2d 926 (Ala.1988) restated the same point on the statutory language. (This case, as stated in Note 1 of this decision was overruled on a civil procedure issue unrelated to its statement of secured transaction law). The case said succinctly of Alabama law on the "true lease"/secured transaction differentiation:

> One reason we reach this conclusion (that the transaction at issue was an Article 9 secured transaction) is that the lease entered into between the College and First Continental is not a "true" lease, but is, instead a lease in the nature of a security interest, as contemplated by *Ala.Code* (1975) § 7–1–201(37) and § 7–9–102. *These sections establish that a "lease" allowing the lessee to purchase at a "nominal consideration" the subject-matter of the lease is to be considered a security agreement rather than a "true" lease.* See *Commerce Union Bank v. John Deere Industrial Equipment, Co.*, 387 So.2d 787 (Ala. 1980); see generally B. Clark, *The Law of Secured Transactions under the Uniform Commercial Code,* at 1–25 through 1–29 (1980). (emphasis added)

*Lawson State* at 929.

Alabama's Supreme Court has thus applied the statute in a straightforward manner. Its view is that if a party may acquire the subject matter of the agreement and/or exercise the purchase option solely by fulfilling his rental obligations for either no additional consideration or only a nominal consideration, the transaction creates a security interest as defined under *Ala.Code § 7–1–201(37).*

*C. This court, and the United States District Court for the Northern District of Alabama, have also found that Section 7–1–201(37) controls.*

As noted above, this court has dealt with the identical legal issues presented by Rent–A–Center's objection to confirmation and motion to terminate stay on past occasions. A detailed examination of the same issues centering on the same code sections urged by Rent–A–Center in the Shelby case can be found in the consolidated cases of *Mattie Pearl Burton, Jacqueline Norwood, Nellie Mary Ward, Deletha Washington, Josephine Woods,* 128 B.R. 807 (Bankr.N.D.Ala.1989) (unpublished). United States District Judge Clarence W. Allgood wrote the decision affirming this case

on appeal in *Colortyme v. Burton et al.*, 128 B.R. 820 (N.D.Ala.1989).

1. *Ala.Code § 8–25–1 et seq.* is a disclosure statute and does not supersede or usurp the Uniform Commercial Code

■ *Burton et al.* addressed another rental creditor's contentions that *Ala.Code § 8–25–1 et seq.* should control instead of Section 7–1–201(37). Colortyme, a creditor which had rented to Chapter 13 debtors, as does Rent–A–Center in this case, contended that since its agreement conformed to *Section 8–25–1 et seq.*, the Uniform Commercial Code was inapplicable.

*Ala.Code § 8–25–1 et seq.*, commonly referred to as the Rental–Purchase Agreements Act, was adopted by the Alabama Legislature in 1986. It is a *disclosure* statute, governing release of pertinent information to the consumer on leases of personal property for *less than four months. See generally In re Brown*, No. BK 88–09488 (Bankr.N.D.Ala. March 1, 1989) (unpublished); *Burton et al.*

The "Rental–Purchase Agreements Act" of 1986 was patterned after the federal Truth–In–Lending law provisions contained in part of Title 15, Chapter 14 of the United States Code. Under that federal law, 15 U.S.C. § 1667 governs disclosure on consumer leases of *more than four months.* In 1986, the Alabama Legislature adopted *Ala.Code § 8–25–1 et seq.* to fill the gap for leases of personal property of *less than four months.*[6] As noted in *Burton*, the federal Truth–In–Lending act is primarily a disclosure statute and does not change substantive law. Neither does the Alabama statute relied on by Rent–A–Center.

2. The Uniform Commercial Code can control a disguised security interest, even if it is not defined as a "credit sale" in *Ala.Code § 5–19–1(4)*

■ Rent–A–Center specifically contended in its motion that its transaction with the Shelbys was not a credit sale as defined by *Ala.Code § 5–19–1(4)*,[7] part of the state "Mini–Code" on consumer credit. This is probably true since this code section was specifically amended in 1986 to include new language reading: "A rental-purchase agreement that complies with the requirements of the definition of rental-purchase agreements is not a credit sale."

Rent–A–Center did not address whether the Uniform Commercial Code controlled in its motion or in oral argument. As the Alabama Court of Civil Appeals stated in *Jefferson v. Mitchell Select Furniture Co.*, 56 Ala.App. 259, 321 So.2d 216 (Ala.Civ. App.1975), the Mini–Code *supplements* the Uniform Commercial Code. So a transaction can be excepted from the definition of "credit sale" in the Mini–Code and still be a U.C.C. Article 9 secured transaction.

3. Subsequent legislation may not *impliedly* repeal provisions of the Uniform Commercial Code

■ The underlying policy goals of adoption by Alabama and other states of the Uniform Commercial Code are expressly set out in U.C.C. Section 1–102(2), *Ala. Code § 7–1–102(2)*:

(1) This title shall be *liberally construed* and applied to *promote its underlying purposes and policies.*

(2) Underlying purposes and policies of this title are:

---

6. *Burton et al. supra* at n. 1, —— B.R. at ——, citing to Acts of Alabama, 1986, Act No. 86–497. *See also Ala.Code § 8–25–1(5).*

7. *Ala.Code § 5–19–1(4)* provides:

CREDIT SALE. Any sale with respect to which credit is extended or arranged by the seller. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property or services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract. *A rental-purchase agreement that complies with the requirements of the definition of rental-purchase agreements is not a credit sale.* (emphasis added for new language added to the Code in 1986. Code cross-references to the definition of rental-purchase agreement in Section 8–25–1 et seq.)

(a) To *simplify, clarify and modernize* the law governing commercial transactions;

(b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) To make *uniform* the law among the various jurisdictions. (emphasis added)

Additionally, U.C.C., as Alabama state law, specifically addresses the issue of implied repeal by later statute through *Ala. Code § 7-1-104:*

**Construction against implicit repeal.**
This title being a general act intended as a unified coverage of its subject matter, *no part* of it shall be deemed to be *impliedly repealed by subsequent legislation* if such construction can be reasonably avoided. (emphasis added)

Consequently, courts may not construe later statutes of limited scope and vastly different policy goals to effect an implied repeal or supersession of U.C.C. sections. To do so would violate the main policy goal of Alabama's adoption of U.C.C. In the issue of "true lease" versus security interest, *Ala. Code § 7-1-201(37)* controls, not *Ala. Code § 8-25-1 et seq.* or *Ala. Code § 5-19-1(4).*

*D. Under Ala. Code § 7-1-201(37), the Shelby—Rent-A-Center transaction was a time-purchase agreement which created a security interest in the television.*

The Shelby—Rent-A-Center transaction must be analyzed in the context of the applicable law: *Ala. Code § 7-1-201(37).* There are two particularly salient points in the transaction: 1. White's testimony that the Shelbys could return the television at any time without being committed for payments beyond the time it was in their possession and 2. that after completing their 78-week obligation, they would own the set free and clear, without an additional purchase payment.

The second point, set out in Paragraph 3 of the security agreement, is dispositive of this case. It makes the transaction a credit sales arrangement and leaves Rent-A-Center with a security interest in, but no right to immediate possession of, the television.

1. A "right to terminate" does not make a consumer transaction a "true lease" or "true rental"

At the March 5, 1991 hearing, Rent-A-Center account representative Staffon White testified that the Shelbys could have walked away from the television transaction at any point without owing anything but rental for the time the set was in their possession. Debtor Billy Wayne Shelby, however, testified "it was never clarified" to him whether the television could be returned without additional payments.

Some courts and the 1987 draft of Article 2-A of the Uniform Commercial Code, and an accompanying proposed amendment of U.C.C. Section 1-201(37), take the position that if the debtor may terminate the agreement without paying the full purchase price, the transaction is a "true lease." [8]

**8.** *In re Glenn,* 102 B.R. 153 (Bankr.E.D.Ark. 1989); *In re Unger,* 95 B.R. 761 (Bankr.D.Ore. 1989); *In re Armstrong,* 84 B.R. 94 (Bankr.W.D. Tex.1988), *but see contra In re Aguilar,* 101 B.R. 481 (Bankr.W.D.Tex.1989) by the same court in a consumer transaction; *Matter of Martin,* 64 B.R. 1 (Bankr.S.D.Ga.1984); *In re Opelika Mfg. Co.,* 67 B.R. 169 (Bankr.N.D.Ill.1986); *In re Peacock,* 6 B.R. 922 (Bankr.N.D.Tex.1980); *In re Huffman,* 63 B.R. 737 (Bankr.N.D.Ga.1986) and *In re Pledger Roy Wood,* 7 B.R. 543 (Bankr.N.D. Ga.1980), *but see contra Matter of Fulton Textiles,* 116 B.R. 302 (Bankr.N.D.Ga.1990); *In re Mesa Refining, Inc.,* 65 B.R. 724 (Bankr.D.Colo. 1986); *Elcan Investments, Inc. v. Kirk,* 371 S.E.2d 146 (Ga.App.1988).

The amendment of U.C.C. Section 1-201(37), proposed in the U.C.C.1987 Official Text to accompany new Article 2-A on leases would include new language providing the following critical differentiation between leases and security agreements:

Whether a transaction creates a lease or a security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease *not subject to termination by the lessee,* and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nom-

This position is known as the "termination", "one-factor" or "walk-away" test of whether a transaction is a rental or a U.C.C. secured transaction.

However, Article 2–A is not yet law in Alabama. An unamended Section 7–1–201(37) still provides that a transaction is intended as a security interest if the persons who acquire the goods may own them by fulfilling terms of the rental—without paying additional consideration. Additionally, the better-reasoned view is that the "termination" or "one-factor" test is not realistic or equitable in consumer lease/rental situations.

An example of that better-reasoned view is the discussion of Bankruptcy Judge Keith M. Lundin in *In re Puckett*, 60 B.R. 223 (Bankr.M.D.Tenn.1986), *aff'd by In re Puckett*, 838 F.2d 471 (unpublished, text in WESTLAW) (6th Cir.1988). (This case consolidated the cases of five Chapter 13 debtors who had all dealt with two rental firms.) Judge Lundin expressed his views on leases of household furniture with a right to terminate.

> The right to terminate has historical significance, *but the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. Aoki, [v. Shepherd Machinery Co.],* 665 F.2d [941] at 946 n. 7 [ (9th Cir.1982) ]; *and see Davis, [v. Colonial Securities Corp.],* 541 F.Supp. [302] at 305 [ (E.D.Pa.1982) ]. If the right to cancel is wholly arbitrary and without penalty, it is, indicative of bona fide intent to lease. *Where the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for by the debtor as part of the underlying sale. See [Pippin Way Inc. v.] Four Star Music,* 2 B.R. [454] at 460 [ (M.D.Tenn. 1979) ].

inal additional consideration upon compliance with the lease agreement, or
 (d) the lessee has an option to become the owner of the goods for no additional consid-

[T]he great majority of CLN customers come to understand the unreality of the termination option and complete payments to avoid forfeiting property for which they have paid several times value. (emphasis added)

*Puckett* at 239.

This court, like the United States Court of Appeals for the 6th Circuit, agrees with Judge Lundin and once again rejects the "termination," "one factor" or "walkaway" test as dispositive of the "true lease" versus security interest question in consumer transactions. It is the same position the court took in *Burton et al.*, affirmed by United States District Judge Clarence W. Allgood in *Colortyme v. Burton;* it is the same position the court took in *In re Betty Jean Graham*, No. BK 85–3532 (Bankr.N.D.Ala. May 2, 1986, as supplemented by May 16, 1986 Additional Findings of Fact and Conclusions of Law), affirmed by United States District Judge James H. Hancock, No. CV–86–H–1055–W (N.D.Ala.1986), (opinions unpublished).

As the Sixth Circuit appeals court said in the unpublished opinion upholding the Bankruptcy Court in *In re Puckett:*

> As the bankruptcy court stated, the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. The bankruptcy court noted that where the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for by the debtor as part of the underlying sale.

*Puckett*, text on WESTLAW.

In following *Puckett*, the Bankruptcy Court *In re Aguilar*, 101 B.R. 481 (Bankr. W.D.Tex.1989) rejected its own precedent in *In re Armstrong*, 84 B.R. 94 (Bankr.W. D.Tex.1988) because it found the total circumstances of a consumer rental distin-

eration or nominal additional consideration upon compliance with the lease agreement. (emphasis added)

guishable on the facts. It found that the consumer television rental agreement created an obligation on the part of the consumer sufficient to make the transaction an Article 9 secured transaction:

> This case is distinguishable from *Armstrong* in a number of important respects. First of all, the cost to purchase the item in question is a moving target, decreasing with each additional payment. The contract provides that the purchase option is computed by taking "the total of weekly payments, less total of rental payments already paid, multiplied by 66 percent." By contrast, in *In re Oerke*, 63 Bankr. 1 (Bankr.N.D.Tex.1986), the purchase price was unaffected by the number of payments to be received by the creditor. *If the purchase price is less affected by market forces than it is by the payment scheme set out in the contract, it cannot be seriously argued that there is in fact any option to purchase whatsoever.* (emphasis added)

*Aguilar* at 482.

As pointed out a similar arrangement in *Waldron v. Best TV and Stereo Rentals, Inc.*, 485 F.Supp. 718, 719 (D.Md.1979): "despite the presence of the termination clauses, the agreement was essentially a contract for the credit sale of the TV set to plaintiff for a sum substantially greater than the cash value of the set."

The "one factor" test does not take into consideration the grossly unequal bargaining positions of the consumer of rental household items and the businesses which rent household items. Most customers of such rental businesses are unsophisticated, low-income persons who have few options for acquiring household goods.

Indeed, counsel for Rent–A–Center pointed out in making equitable arguments that such rental businesses serve a market of consumers who have few other alternatives available to them for acquiring furnishings.

It is proper that such firms charge rates reflecting the risks of doing business with this economically vulnerable segment of the economy. It is also proper, however, that the courts apply a different standard in evaluating transactions between a corporation and these individuals, than that applied to the lease industrial equipment hammered out by counsel for two corporations.

The "termination" test and the proposed amendment of U.C.C. Section 1–201(37) (to accompany enactment of Draft Article 2–A of U.C.C.) which attempts to codify, it may be appropriate when the "lease" involves heavy manufacturing equipment, and two bargaining entities of relatively equal sophistication and resources. But it is not an appropriate test to apply to consumer rentals of small items of household goods.

2. Consumer rent-to-own transactions create real obligations, despite the inclusion of "termination" or walk-away clauses in the written contract

■ Generally, bankruptcy courts finding rent-to-own consumer contracts are "true leases" have based their reasoning on the premise that under the written agreement the debtor has no obligation to the rental company for a fixed sum, thus there is no debt for the Article 9 security interest to "secure."

This game of words v. substance, appears to have its genesis in Note 7 of *In re J.A. Thompson & Son, Inc.*, 665 F.2d 941 (9th Cir.1982). In that case, the United States Court of Appeals for the Ninth Circuit held that a lessor of industrial equipment had only a security interest, not a reversion, in the equipment because of a purchase option for little additional compensation. The note is worth including here:

> The theory which apparently underlies the decisions in these cases and which serves as the basis of Shepherd's argument was articulated by Peter F. Coogan in *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9*, 5 Duke Law Journal 909 (1973). Coogan maintains that the Uniform Commercial Code must be interpreted in light of pre-code law, specifically the Uniform Conditional Sales Act ("UCSA"). Since the UCSA required that the purchaser be obligated to pay an amount substantially equal to the purchase price of the property before a

transaction could be deemed a conditional sale, Coogan contends that before a lease can be subject to the provisions of Article 9 of the Uniform Commercial Code, the lessee must be obligated to pay in rent an amount substantially equivalent to the designated purchase price of the property. When a lessee has the right to terminate a lease before making such an equivalent payment, as does Thompson in the instant case, he has not really assumed an obligation that would satisfy the requirements of the UCSA. Thus, Coogan argues, a right to terminate by the lessee before an amount equivalent to the purchase price is paid should, for purposes of determining whether a lease is intended for security, outweigh the impact of an option to purchase for nominal consideration, leaving the agreement a "true" lease.

*Although Coogan's theory has some historical appeal, we remain unpersuaded.* (emphasis added)

*Thompson* at 946, n. 7.

The Sixth Circuit was also unpersuaded as it discussed this specific argument, citing the *Thompson* case and the Coogan theory, as it upheld Judge Lundin's rejection of the "termination" or "walkaway"/"no obligation" test in *In re Puckett*. Nevertheless, some bankruptcy courts [9] have adopted this view, finding that no obligation exists for the debtor in such transactions—therefore no secured transaction has been created.

The Ninth Circuit held that the statute itself, California's version of U.C.C. 1–201(37) gives the rule of construction. That critical part of the section is identical to the corresponding portion of *Ala. Code § 7–1–201(37)*. The appeals court said:

In subsections (a) and (b), however, two plain rules of construction are set out. While a purchase option does not in itself make a lease one intended for security (§ 1207(37)(a), a purchase option exercisable for no or nominal consideration *"does make"* the lease one intended for

security (§ 1201(37)(b)). *We conclude from this that subsection (b) provides an exception to the general rule, whereby one fact in a given case takes on determinative significance. Thus, if a lease contains an option to purchase "for no additional consideration or for nominal consideration," it is conclusively presumed to be "intended as security," without reference to other facts from which the opposite reference might be drawn.* (emphasis added)

*Thompson* at 946–47.

Once a consumer enters such contracts, it can be generally said that if he is unable to exercise the option he has forfeited money, thus he is obligated to continue paying in order to maintain his rights. He is obligated to continue paying in order to prevent the rental firm's removal of the rented object from his home—the factual equivalent of repossession.

In most such transactions, including the Shelby—Rent–A–Center agreement—the security interest in the property (Rent–A–Center's right to reclaim the television) secures the Shelby's obligation to perform the contract, week by week, to prevent the repossession of the television and loss of what the Rent–A–Center agreement itself calls "rights or options" previously acquired under this Agreement."

At the end of 78 weeks, the Shelbys would have invested $1,481.22 in a used television, the exact amount listed in the blank for "value" of the television on Claim No. 4. With each week that passed without default, another $18.99 would have been deducted from the sum required for them to own the television, and added to the investment the family had in the set. Rent–A–Center's security interest secures the ongoing obligation that the Shelbys were to meet or lose both their television and the money they had already paid for it. This projected payment obligation was interrupted by the threat of garnishment by the hospital and the advice of debtor's

**9.** *In re Glenn,* 102 B.R. 153 (Bankr.E.D.Ark. 1989); *In re Unger,* 95 B.R. 761 (Bankr.D.Ore. 1989); *In re Huffman,* 63 B.R. 737 (Bankr.N.D. Ga.1986) and *In re Armstrong,* 84 B.R. 94 (Bankr.W.D.Tex.1988).

counsel as she prepared this Chapter 13 plan.

3. Paragraph 3 of the rental agreement is dispositive—Rent–A–Center holds a disguised security interest in, not title to, the television

■ As stated in the facts, Paragraph 3(B) of the agreement between Rent–A–Center and the Shelbys states:

> B. If you renew this agreement for *78* successive weeks, you will pay a total of *$1,481.22*, or if you renew this agreement for *N/A* successive months, you will pay a total *$N/A*, and will own the property.

*Ala.Code § 7–1–201(37)*, which controls the issue of "true lease" versus security interest provides in part:

> ... an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property *for no additional consideration* or for a nominal consideration *does make the lease one intended for security.*

It seems clear that ownership at no additional consideration or only nominal consideration makes the transaction a security interest under Alabama's U.C.C. based on the statute. Additionally, the *Alpha Creamery* factors, adopted in construing Section 7–1–201(37) by the Alabama Supreme Court, would point to a secured transaction based on the Shelby facts.

Rent–A–Center holds only a security interest, not full title ownership, in the television it conveyed to the Shelbys in the agreement. Since it holds a security interest instead of ownership, it must obtain relief from the automatic stay of 11 U.S.C. § 362(a) to reclaim the television.

## II.

## RENT–A–CENTER DID NOT MAKE A CASE FOR RELIEF FROM THE AUTOMATIC STAY OF 11 U.S.C. § 362

Debtor Billy Wayne Shelby told the court that he went to a bankruptcy attorney when he learned, within four days after he rented the television, that a garnishment of his $210 per week take-home pay was imminent. His attorney directed him to bring her all his bills so that she might prepare the Shelbys' Chapter 13 petition and plan.

■ A major protection offered Chapter 13 debtors like the Shelbys under the Bankruptcy Code is the automatic stay provided in 11 U.S.C. § 362(a).[10] It is called the "automatic stay" because it takes effect by operation of law with the filing of the bankruptcy petition. The stay prevents creditors from foreclosing or repossessing property while the debtors attempt to reorganize their personal finances under Chapter 13.

■ Many Chapter 13 debtors file their petitions, as did the Shelbys, to avoid or remove a garnishment of their wages. The

---

**10.** 11 U.S.C. § 362(a) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC 78eee(a)(3), operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of a case under this title;

(2) the enforcement against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing the debtor that arose before the commencement of the case under this title against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

stay thus halted any move to enforce the hospital's unsecured debt by garnishment and it halted any move to repossess collateral by other entities who held secured obligations against the Shelbys—until and if the court might grant relief from stay under Section 362(d). (In Chapter 13, the stay remains in effect until the debtor completes his plan and is discharged, or the case is otherwise closed or dismissed, as provided in Section 362(c)(2).)

## A. There are two avenues for a secured creditor to receive relief from the automatic stay

11 U.S.C. § 362(d) provides the means by which a court may protect a secured creditor whose interest is being unduly damaged by the stay. Section 362(d)(1) is the most frequently used in Chapter 13 cases. It provides:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
> (1) for cause, including the *lack of adequate protection* of an interest in property of such party in interest; (emphasis added)

Section 362(d)(2) adds another two-pronged ground for granting relief from stay by providing:

> (2) with respect to a stay of an action against property under subsection (a) of this section, if—
> (A) the debtor does not have an equity in such property; and
> (B) *such property is not necessary to an effective reorganization.* (emphasis added)

Both elements—that the debtor have no equity in the property and a finding that the debtor does not need the property for effective financial reorganization—must be present for the court to grant relief under Section 362(d)(2).

■ Under 11 U.S.C. § 362(g), the party seeking relief from stay has the burden of proof on the issue of the debtor's equity in the property; the party opposing the relief, on all other issues. The court will first examine the Shelby facts in the context of Section 362(d)(2).

## B. Rent–A–Center may not receive relief from stay under 11 U.S.C. § 362(d)(2)

At the time the Shelbys filed the bankruptcy petition, they had made only the initial ($29.38) payment, and White estimated their arrearage at $106 in testimony at the March 5, 1991 hearing. Rent–A–Center offered no evidence of the fair market value of the collateral at the hearing. The Shelbys' arrearage was in excess of the dollars they had put into the contract at the time of the hearing.

In addition to a showing of no equity, however, Section 362(d)(2)(B) requires that the collateral not be necessary for the effective reorganization of the debtors.

■ In their Monthly Income and Expense Statement, the Shelbys estimated that they could live on $806.00 per month while making payments to their Chapter 13 plan. That plan budgeted $200.00 per month for rent; $150.00 for utilities; "$300 (plus Food Stamps)" for food; $25.00 for clothing; $11.00 for medicine and drugs; and $120 for transportion (gas, etc.) By the category labelled "Recreation & Entertainment," the Shelbys budgeted "0.00".

The Shelbys have two infant children—sons, aged two and six months. At the present time, their income is even more limited that it was at the point when they filed Chapter 13. Making payments to their Chapter 13 plan will curtail most opportunities for entertainment outside the home. Billy Wayne Shelby testified that the television at issue here was the only television in the home. Consequently, in the context of late 20th Century American society in general and of the particular needs of this young couple, it is the court's opinion that possession of the television is necessary to the Shelbys' effective reorganization of their personal finances.

Therefore, Rent–A–Center may not be granted a termination of the stay under Section 362(d)(2).

*C. Rent–A–Center has been provided with adequate protection, therefore it may not receive termination of the stay under Section 362(d)(1)*

■■ 11 U.S.C. § 361 [11] defines the bankruptcy term "adequate protection" as used in the context of a creditor's motion for relief from the automatic stay. Section 361 provides that adequate protection may be granted a creditor by three means: 1. by cash payment or periodic cash payments; 2. by additional or replacement lien; or 3. other arrangement which guarantees the creditor the "indubitable equivalent" of its interest in the collateral. The most common means of guaranteeing a creditor adequate protection is providing periodic cash payments (Section 361(1)).

On March 5, 1991, the court from the bench ordered the Shelbys to pay $35.00 per month to Rent–A–Center through their Chapter 13 plan until the full balance of the 78–week contract with Rent–A–Center ($1,451.84, according to Claim No. 4) is paid. The court additionally directed the entry of a new payroll deduction order .of $24.00 per week on Mrs. Shelby's grocery store paycheck. So the funds to provide Rent–A–Center's payment will go straight to the Chapter 13 Trustee's Office which will distribute the $35.00 to Rent–A–Center.

It is the judgment of the court that this payment of 100 percent of the contract, by payroll deduction and through the Chapter 13 Trustee, constitutes adequate protection of Rent–A–Center's interest as defined by 11 U.S.C. § 361. Therefore, Rent–A–Center may not obtain termination of the automatic stay under 11 U.S.C. § 362(d)(1).

*D. Since it cannot fulfill the requirements of 11 U.S.C. § 362(d), Rent–A–Center may not be granted relief from stay*

As delineated above, the elements are not present in the facts of this case to afford Rent–A–Center relief from the Section 362(a) stay under either Section 362(d)(1) for a lack of adequate protection or under Section 362(d)(2) since the property is necessary to help make the Shelbys' reorganization plan effective.

Therefore, Rent–A–Center's motion to terminate the stay must be denied.

## CONCLUSION

The following conclusions can be drawn from this discussion of law and fact:

1. *Ala. Code § 7–1–201(37)* in particular and the Uniform Commercial Code in general controls on the issue of whether an agreement creates an executory contract or a secured transaction.

2. That Paragraph 3 of the January 12, 1991 agreement allowing the Shelbys to own the television at no consideration beyond their rental payments means this transaction is an Article 9 secured transaction in which Rent–A–Center holds a Section 7–1–201(37) security interest.

3. The automatic stay of 11 U.S.C. § 362(a) applies to personal property in which the provider reserves such security interest. Consequently, it applies to Rent–A–Center's rights against the television and the Shelbys.

4. Rent–A–Center must obtain relief from stay from the court to regain possession of the television. Relief from stay is only available through proof of the ele-

**11.** 11 U.S.C. § 361 provides:

**Adequate protection.**

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a *cash payment or periodic cash payments* to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an *additional or replacement lien* to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the *indubitable equivalent of such entity's interest* in such property. (emphasis added)

ments required under 11 U.S.C. § 362(d)(1) and (2). Since Rent–A–Center cannot meet the requirements of 11 U.S.C. § 362(d)(1) or (2), it may not receive relief from stay.

5. Therefore Rent–A–Center's objection to confirmation of the Shelbys' Chapter 13 plan is hereby to be OVERRULED and its motion to terminate the stay is hereby DENIED.

This memorandum shall constitute findings of fact and conclusions of law under Bankr.R. 7052. A separate order will be entered consistent with this opinion.

DONE AND ORDERED.