In re Mattie Pearl BURTON, Jacqueline Norwood, Nellie Mary Ward, Deletha Washington, Josephine Woods, Debtors.

**Bankruptcy Nos. BK87-00888, BK88-02452, BK88-02672, BK86-09928 and BK88-01782.**

United States Bankruptcy Court, N.D. Alabama, W.D.

Jan. 20, 1989.

See also 128 B.R. 820.

Edwina Miller, Tuscaloosa, Ala., for debtor Mattie Pearl Burton.

Joseph G. Burns, Jr., Tuscaloosa, Ala., for debtor Jacqueline Norwood.

Thomas A. Nettles IV, Tuscaloosa, Ala., for debtor Nellie Mary Ward.

Edwina Miller, Tuscaloosa, Ala., for debtor Deletha Washington.

Phillip Lisenby, Tuscaloosa, Ala., for debtor Josephine Woods.

Jane K. Dishuck, Standing Trustee, Tuscaloosa, Ala.

Bobby Wooldridge, Tuscaloosa, Ala., for trustee.

Donna Smalley, Tuscaloosa, Ala., for Colortyme, Inc.

## MEMORANDUM OF DECISION

This matter came before the Court on the Creditor's Motion to Terminate Section 362(a) Stay and Objection to Confirmation in six separate cases. (One of which has been dismissed so that this dismissed case is not considered in this opinion).[1] The creditor's attorney, the attorneys for the debtors, the standing trustee and a specially appointed attorney all participated in the trial on the merits and submitted briefs in support of their positions. All parties desired to have the ultimate issue as to whether or not the transaction was a true lease or a disguised security agreement decided by this court. This memorandum shall constitute findings of fact and conclu-

1. The motions for relief from stay and objections to confirmation are a misnomer due to the fact that in three of the five cases, the confirmation order had been entered prior to the time of the filing of an objection to confirmation. Further, the Burton and Snider cases had been filed and confirmed even before the debtor entered into the purported lease contract.

sions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

Between November 17, 1987 and February 20, 1988 Colortyme Rentals, Inc. (hereinafter Colortyme) entered into several agreements with six separate debtors. (Wanda Plowman since dismissed, is not included in this discussion). Debtors Burton and Snider had filed their chapter 13 petitions *prior* to entering into the agreement with Colortyme so that these were post-petition obligations under Section 1305(a)(2).[2] The cases[3] were consolidated for trial inasmuch as each case turned on a determination of the same issue, and the facts of each case are sufficiently similar so as to render consolidation feasible and in the best interest of judicial economy. Each case presents the same controlling issue: Whether the agreements between the debtors and Colortyme are "true leases" or "disguised credit sales"?

Although the dates of filing the Chapter 13 petitions and the dates of entering into the agreements in question vary among each debtor, the substantive facts before the Court are the same and are summarized as follows:

1) The debtor would either visit or call Colortyme and request that merchandise of the debtor's choice be delivered to the debtor's home.

2) While in the Colortyme store, or upon delivery of the merchandise, the debtor was asked to sign a document styled "Rental Agreement".

3) The Rental Agreement disclosed whether the merchandise was new or used; the amount and timing of payments to be made by the debtor; charges other than rental payments; the total number of rental payments and the total amount required to be paid in order to acquire ownership of the merchandise; that the debtor was not the owner of the merchandise until the remittance of all required payments, and that liability for loss or damage of the merchandise is to be borne by the debtor.

4) The rental period was established as either week-to-week, two-week-to-two-week, or month-to-month. The usual period of time that any rental agreement could continue was either 78 weeks or 18 months.[4]

5) Additional provisions in the Rental Agreement dealt with termination of the agreement, renewal of the agreement, and ownership by the debtor upon renewal and remittance of the 78th week or 18th month payment. These various provisions are important to the overall effect of the agreement and are discussed in more detail as follows:

a) *Termination:* The debtor had the option of terminating the agreement at any time by surrendering the merchandise to Colortyme and paying any then due rental payments. Trial testimony revealed that the debtor would be charged no penalty for termination. Colortyme had the option of terminating

---

**2.** Colortyme "should have known" under Section 1305(c) by checking with the local credit bureau before the extension of post-petition credit.

**3.** The debtors' name, case number and total number of rental agreements entered into with Colortyme are set out as follows:

| NAME | CASE NUMBER | NUMBER OF AGREEMENTS |
|---|---|---|
| 1. Mattie Pearl Burton | 87–00888 | 2 |
| 2. Jacqueline Norwood | 88–02452 | 1 |
| 3. Wanda Plowman | 88–02308 | 5 |
| 4. Nellie Mary Ward | 88–02672 | 1 |
| 5. Deletha Washington | 86–09928 | 2 |
| 6. Josephine Woods | 88–01782 | 1 |

All the agreements in question contain the same terms and conditions as to rental rights and obligations. The only variances among the agreements are the types of merchandise rented, the rental payment amounts, and the dates of entering into the agreements. Also, the agreement between Colortyme and Nellie Mary Ward could be renewed for 104 weeks or 24 months instead of the usual renewal term of 78 weeks or 18 months. The merchandise in each agreement is a consumer good. Wanda Plowman has now been dismissed.

**4.** Nellie Mary Ward's agreement provides for a renewal period of 104 weeks or 24 months.

the agreement only upon the debtor's failure to make a rental payment or upon the debtor's undertaking to dispose [5] of the merchandise.

b) *Renewal:* The debtor could renew the agreement by simply remitting successive rental payments.

c) *Ownership by the Debtor:* The debtor could obtain ownership of the merchandise by renewing the agreement for 78 successive weeks or 18 successive months. No additional consideration was due Colortyme at the end of the 78th week or 18th month in order for the debtor to become the owner of the merchandise.

6) Trial testimony revealed that should the debtor comply with the terms of the lease for 78 weeks or 18 months the lessee would have paid at least *three* times the dealer-cost value of the merchandise. Trial testimony also raised a question as to whether the debtors had received a full explanation of the terms of the agreement prior to signing.

Appendix A sets out an example of the RENT TO OWN AGREEMENT of Mattie Burton.

Appendix B sets out a chart showing the details of each transaction.

This Court must now decide whether the Rental Agreements are "true leases" or "disguised credit sales".

## CONCLUSIONS OF LAW

### A. EFFECT OF SECTION 8–25–1 ET SEQ. CODE OF ALABAMA, 1975

The creditor's attorney earnestly insists that Ala.Code Section 8–25–1 et seq. is controlling and inasmuch as the particular agreements came within the definition included in such Code Section that it auto-

matically makes the Uniform Commercial Code inapplicable. Such contention is without merit based upon two grounds:

### 1. *A Disclosure requirement.*

The Alabama legislature in 1986 adopted the "Rental–Purchase Agreements Act" of 1986. This act was patterned after the Federal Act contained in part of Title 15, Chapter 14 "consumer credit protection", which is commonly known as the Truth–In–Lending law. 15 U.S.C. Section 1667 governs consumer leases of the Truth–In–Lending act of 1968. Section 1667(1) provides:

(1) The term "consumer lease" means a contract in the form of a lease or bailment for the use of personal property by a natural person for a period of time exceeding four months, and for a total contractual obligation not exceeding $25,000, primarily for personal, family, or household purposes, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease, except that such term shall not include any credit sale as defined in section 103(g) [15 USCS Section 1602(g)]. Such term does not include a lease for agricultural, business, or commercial purposes, or to a government or governmental agency or instrumentality, or to an organization. (Underlining for emphasis)

In 1986, to fill the gap for leases of personal property *less than four months,* the Alabama legislature enacted 8–25–1 et seq.[6]

The federal truth-in-lending act is primarily a *disclosure* act and does not change substantive law. Eg. under truth-in-lending a disclosure of 200% interest rate— 200% APR—would satisfy the disclosure

---

5. The rental agreement stated that the debtor agreed to keep the merchandise in his/her possession at the residence listed on the rental agreement and that the merchandise would not be removed from the residence without the prior approval of Colortyme. The rental agreement further provided that the lessee had no right to sell, mortgage, pawn, pledge, encumber, or otherwise dispose of the merchandise.

6. (5) <u>Rental–Purchase Agreement.</u> An agreement for the use of merchandise by a consumer for personal, family, or household purposes, for an initial period of <u>four months or less</u> that is automatically renewable with each payment after the initial period, and that permits the consumer to become the owner of the merchandise. The term does not include any credit sale as defined in subsection (4) of section 5–19–1. (Underlining for emphasis).

requirements of truth-in-lending, however, it may be usurious.

Colortyme relies heavily on the case of *In re Melton*, Case Number 87–01537–APG, (unpublished) decided by Bankruptcy Judge Pope Gordon in the Middle District of Alabama which upheld the classification of a similar transaction as a "true lease" as follows:

> Were it not for *Ala. Code* Sections 8–25–1 to 8–25–6, the argument of the debtor that the intention of the parties and the Uniform Commercial Code control, would be persuasive. But such is not the case. The authorities cited by the debtor turn on the law of other states which apparently have no provision comparable to Sections 8–25–1 *et seq.*

This Court rejects the reasoning of the *Melton* Court inasmuch as the import and purpose of 8–25–1 et seq. is a *disclosure* statute.

The preamble[7] to the section indicates that the purpose of Section 8–25–1 et seq. is to regulate rental-purchase agreements by the following methods:

1. requiring certain *disclosures* by the merchant

2. regulating advertising

3. authorizing reinstatement

4. and excluding rental-purchase agreements from the definition of "credit sales".[8]

Section 8–25–1 et seq. serves the important and legitimate purpose of disclosing, and doing so in a logical and readily comprehendible manner, pertinent information to the consumer for leases less than 4 months. It does not purport to regulate or provide overall coverage of the type of rental-purchase agreement, nor does it create a new standard by which the true lease vs. disguised security agreement conflict is to be judged.

---

7. *Acts of Alabama,* 1986, Act. No. 86–497.

8. This Court agrees with the position of the creditor that the provisions of section 5–19–1 are inapplicable to agreements in question. However, it must be noted that it is *only the*

## 2. *No repeal of Section 7–1–201(37) of the UCC.*

■ The Court further notes the existence and directive of Section 7–1–104 (UCC–1–104) which states:

*Construction against implicit repeal*

This title being a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided.

UCC–1–104 was enacted so that to make uniform throughout the United States the law governing commercial transactions—such UCC has now been enacted in all 50 states. Because the commercial community throughout the United States relies upon the effectiveness of the Uniform Commercial Code, Section 1–104 requires that subsequent legislation cannot impliedly repeal any provisions of the Uniform Commercial Code. Banks, financial institutions and the commercial community looks with disfavor on any legislation that may change the UCC law of Alabama to be non-uniform. The net result of Section 7–1–104, is that 8–25–1 et seq. cannot impliedly repeal the Uniform Commercial Code and the controlling definition of "security interests" in Section 7–1–201(37). This Court does not state and does not need to rule that they are inconsistent.

As previously noted, it is clear to this Court that Section 8–25–1 et seq. is not intended to entirely or exclusively regulate the topic of rental-purchase agreements. It is equally clear that Section 7–1–201(37) does not abrogate any of the disclosure requirements, prohibited provisions, advertising requirements, or damage provisions of Section 8–25–1 et seq. Neither code Section makes reference preclusive or otherwise, to the other code section and adherence to both sections is possible. Further, adherence to Section 8–25–1 et seq. does not offend, encumber or repeal Section

*provisions of Section 5–19–1* that are barred from application—not the provisions of the UCC and in particular Section 7–1–201(37) which defines a "true lease" or a disguised security agreement.

7-1-201(37) and simultaneous adherence to Section 7-1-201(37) does not offend, encumber, or repeal Section 8-25-1 et seq. These two code sections are completely capable of peaceful co-existence and the directive of Section 7-1-104 can easily be met.

## B. UNIFORM COMMERCIAL CODE 1-201(37) [ALABAMA CODE SECTION 7-1-201(37)] DETERMINES WHETHER A "TRUE LEASE" OR A "DISGUISED SECURITY AGREEMENT"

■ Provision 7-1-201(37) provides in pertinent part:

(37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance of the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. (Underlining for emphasis.)

This Court has previously considered the question of when a true lease is in fact a disguised security agreement in the case of *In re Central Foundry Co.,* 48 B.R. 895 (Bkrtcy.N.D.Ala.1985) and at page 898 where this Court discusses the law of Alabama as follows:

.... If the collateral were personal property, the facts of this case would clearly fall within subsection (b) since New Central was obligated to purchase the "leased" equipment for the nominal consideration of $10.00.

In *Commerce Union Bank v. John Deere Indus. Equip. Co.,* 387 So.2d 787 (Ala.1980), the Alabama Supreme Court listed several factors from the case of *In re Alpha Creamery Co.,* 4

U.C.C. 794, 797-98 (Bktcy.W.D.Mich. 1967) as indicia for distinguishing a true lease from a security interest. The Fifth Circuit Court of Appeals has stated that the Alabama Supreme Court has "adopted" the *Alpha Creamery* factors. *American Standard Credit v. National Cement Co.,* 643 F.2d 248, 261-62 n. 7 (5th Cir. 1981).[9] The following is one of the listed factors:

Lease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or for no additional consideration is deemed intended as a security agreement as a matter of law.

*Commerce Union Bank v. John Deere Indus. Equip. Co.,* 387 So.2d 787, 790 (Ala 1980). Thus, because of all the various factors the Court must conclude that the "lease" in the instant case is "deemed intended as a security agreement as a matter of law."

In *Commerce Union Bank v. John Deere Indus. Equip. Co.,* 387 So.2d 787 (Ala.1980), the Supreme Court of Alabama held a particular transaction was a true lease of certain equipment and the Supreme Court adopted six factors to consider in determining the intent of the parties as to whether it was in fact a true lease or a disguised security agreement—citing *In re Alpha Creamery Co., Inc.,* 4 U.C.C. Rep.Serv. 794, 797-98 (W.D.Mich.1967).

In *Lawson State Community College v. First Continental Leasing,* 529 So.2d 926, 929 (Ala.1988) the Supreme Court held that a purported "lease" of $120,000 heating, ventilating and air conditioning equipment for 60 months payments of $2,618.68 and a "right" to purchase the equipment outright for a "concluding payment of $1.00" was NOT a "true lease", but a disguised security agreement.

The distinction between a "true lease" or a "disguised security agreement" is important in several areas (among others):

---

9. While this Court disagrees with Fifth Circuit Court of Appeal's reading *Commerce Union Bank* as having "adopted" the *Alpha Creamery* factors, we are bound to follow the *American*

Standard court's reading of the *Commerce Union Bank* case. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (adopting 5th Cir. law as of September 30, 1981).

| | TRUE LEASE | DISGUISED SECURITY AGREEMENT |
|---|---|---|
| 1. Lessee's/buyer's interest in property. | Leasehold Estate | Owner |
| 2. Necessity to file UCC–1 | No | Yes |
| 3. Assumption or rejection of executory contract under Bankruptcy Code Sect. 365 | Yes | No |
| 4. Subject to usury laws | No | Yes |
| 5. Compliance with default promises of UCC 9–504 | No | Yes |
| 6. Liability for sales taxes | No | Yes |
| 7. Liability for ad valorem tax | Lessor | Purchaser |
| 8. Truth–In–Lending Disclosures–Consumer | Yes Consumer Lessee Disclosure | Yes Reg. Z Disclosure |

See Clark, "The Law of Secured Transactions under the Uniform Commercial Code (1980) Parag. 1.5, p. 1.22 et seq. and 1988 Cumulative Supplement No. 1, Parag. 1.5, pages S1–11 et seq.

Professor Barkley Clark at Parag. 1.5[4] p. 1–28 distilled the number of key true lease—financing factors to *five* as follows:

(1) *Is the lessee obligated contractually to pay the full purchase price?* If so, the transaction smacks of purchase financing. Some cases use this factor as the only necessary evidence of a disguised secured transaction.

(2) *Is there a purchase option and, if so is it nominal?* In assessing this critical factor under U.C.C. Section 1–201(37), the court should compare the option price with the anticipated fair market value of the property at the time of exercise, as viewed from the inception of the transaction. Alternatively, the courts have compared the option price with total rentals over the lease term or with the original cost of the goods. The bottom line is the economic reality of transaction, that is, would any lessee in its right mind fail to exercise the purchase option?

(3) *Is the lease term equivalent to the economic life of the good?* IF it is, there is no meaningful residual value for the lessor, thus suggesting a financing arrangement rather than a true bailment lease.

(4) *At the expiration of the initial lease term, can the lessee renew indefinitely or for a period extending through the economic life of the goods?* This factor is of course closely related to the prior two.

(5) *Does the lessor retain any meaningful residual value in the goods?* When the lessor parts with any residual value because of a termination adjustment clause in an open-end lease which allows the lessor to sell the goods at termination or default, collect any deficiency, or turn over any surplus to the lessee, the transaction looks more like a financing arrangement. In effect, the lessee is guaranteeing the residual value of the leased goods.

See also J. White & R. Summers, Handbook of the Law under the Commercial Code, (2nd Ed.1980) p. 882–83 which lists some *9* factors.

Cf. REV.RVL. 55–540, 55–2 C.B. 39 where the IRS sets out 9 or more factors to determine whether a *sale* where the purchaser is entitled to *depreciation* or *lease* where the lessee is entitled to rent deductions.

In a well-reasoned opinion in the case of *In re Puckett,* 60 B.R. 223 (Bkrtcy.M.D. Tenn.1986), Bankruptcy Judge Keith M. Lundin discussed the lease of furniture similar to the case at bar. Judge Lundin discussed the history of the distinction between true leases and disguised security agreements and developed 14 factors to consider in deciding whether a transaction was a true lease or a disguised security agreement. Judge Lundin went on to discuss the factor of "the right to terminate".

The right to terminate has historical significance, but the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. *Aoki [ v. Shepherd Machinery Co.],* 665 F.2d [941] at 946 n. 7; [(9th Cir.1982)] *and see Davis [v. Colonial Securities Corp.],* 541 F.Supp. [302] at 305. [(D.C.Pa. 1982)] If the right to cancel is wholly arbitrary and without penalty, it is, indicative of bona fide intent to lease. Where

the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for by the debtor as part of the underlying sale. *See [In re] Four Star Music,* 2 B.R. [454] at 460. [(Bkrtcy. M.D.Tenn.1979)]

. . . .

The great majority of CLN customers come to understand the unreality of the termination option and complete payments to avoid forfeiting property for which they have paid several times value. See also *Claude v. Rent–It Corp.,* 685 F.2d 245 (8th Cir.1982); *Leasing Services Corp. v. American National Bank & Trust Co.,* 19 U.C.C. Rep.Serv. 252 (U.S. District Court, N.Y., 1976); *Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885 (S.D. Ohio, 1983); *In re Teel,* 9 B.R. 85 (Bkrtcy. N.D.Texas, 1981). See also *City Leasing Co. v. Entertainment Family Style,* 825 F.2d 1497 (11th Cir.1987) (Judge Robert Vance considered 7 factors in ruling that the contract was a disguised security agreement).

Some courts [10] and the new 1987 version of Article 2–A of the Uniform Commercial Code (which has not been adopted as yet in Alabama) take the view that this factor is conclusive. This is the "One Factor" or "Termination" or "Walk Away" Test, that is, if the debtor can at any time stop paying (walk away) from the transaction and will not thereafter be obligated to pay the full purchase price, then this one factor will make the transaction a "true lease". Article 2A version 1–201(37) amended by 1987 adopting this *one* factor as conclusive as follows:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest <u>if the consideration the lessee is to pay the</u>

<u>lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and</u>

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement. (Underlining for emphasis.)

This Court rejects the one factor (or termination test or walk away test) as not very realistic particularly in consumer lease situations. Eg. Lease of TV, refrigerators, VCR, stereo, end table, living room suite, dining room suite, etc. Here, there is an original term of one week, but after one week, weekly renewals for 78 weeks (1½ years), the purchaser becomes the owner for no consideration. The one factor test does not take into consideration the sophistication of the parties—here the parties are unsophisticated and are willing to pay 3 times the fair market value for the right to "rent to own". The debtor in each one of the cases was advised by their attorneys that it would be to the debtor's best interest to allow the collateral to be returned to Colortyme, however, in each instance the debtor wanted to continue to make the payments on the collateral and to keep the collateral. The debtors were unsophisticated and on the lower economic rung of the ladder—they had no place else to go in order to obtain this furniture,

---

**10.** *In re Armstrong,* 84 B.R. 94 (Bkrtcy.W.D.Texas 1988); *Matter of Martin,* 64 B.R. 1 (Bkrtcy.S. D.Ga.1984); *In re Opelika Mfg. Corp.,* 67 B.R. 169 (Bkrtcy.N.D.Ill.1986); *In re Peacock,* 6 B.R. 922 (Bkrtcy.N.D.Texas 1980); *In re Huffman,* 63 B.R. 737 (Bkrtcy.N.D.Ga.1986); *In re Pledger Roy Wood,* 7 B.R. 543 (Bkrtcy.N.D.Ga.1980); *In re Mesa Refining, Inc.,* 65 B.R. 724 (Bkrtcy.D. Colo.1986); *Elcan Investments, Inc. v. Link,* 187 Ga.App. 676, 371 S.E.2d 146 (1988).

televisions, stereos, etc. Further, the debtors understood that they were paying three times the fair market value, however, they persisted in their desire to keep the collateral and "pay for it".

This 1987 version of 1–201(37) may well be appropriate for $500,000 draglines, $100,000 equipment, etc. but not for consumer rentals of small items of household goods.

Applying the applicable 14 factors of *In re Puckett,* supra, the court finds that the Colortyme transactions are not true leases but are disguised sales of goods.

This Court in a similar case of *In re Betty Jean Graham,* BK85–3532 (unpublished) held on May 2, 1986, as supplemented by the May 16, 1986 Additional Findings of Fact and Conclusions of Law, that a purported consumer lease of a bedroom suite from Babers Leasing for weekly rentals of $20.00 with a zero option to purchase after 88 weeks was not a true lease but a disguised security agreement. Such decision was appealed and affirmed by District Judge James H. Hancock on September 11, 1986 CV86–H–1055–W (Unpublished) holding that the option to purchase in the purported lease "transferred that document, under the undisputed facts, into a 'security interest'."

Having determined that claims of Colortyme are disguised security interests, a separate order treating such claims will be entered in accordance with F.R.B.P. 7052.

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. A separate order will be entered in accordance with the foregoing.

DONE AND ORDERED.