In re Kristina TRUSTY, Debtor.

In re Thomas F. HOBBS, Sr., Debtor.

In re Shelly J. LONG, Debtor.

Bankruptcy Nos. 95–01801–BGC–
13, 95–03259–BGC–13 and
95–03588–BGC–13.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Nov. 9, 1995.

Mary Amos, Birmingham, AL, for Debtor Kristina Trusty.

Michael Trucks, Fairfield, AL, for Debtor Thomas F. Hobbs, Sr.

Rebecca Bozeman, Birmingham, AL, for Debtor Shelly J. Long.

David P. Rogers, Jr., Chapter 13 Standing Trustee.

John Frawley, Irondale, AL, for Action Rentals, Inc. and Furniture Plus, Inc.

## ORDER DENYING MOTIONS FOR RELIEF FROM STAY

BENJAMIN COHEN, Bankruptcy Judge.

The three cases subject to this order are not consolidated but are connected by a common issue. That issue is whether a rent-to-own agreement is a lease for rental of property or is a security agreement representing a sale of property. In each case the non-debtor merchant has asked this Court for relief from the automatic stay to allow it to pursue whatever non-bankruptcy remedies it may have against its debtor. All three debtors have asked the Court to require the merchants to treat the agreements as sales agreements. In all three cases the merchants maintain that the agreements are not sales agreements but are leases.[1]

In *In re Trusty*, case No. 95–01801, this matter came before the Court on a *Motion for Relief from Stay* filed on May 30, 1995 by Action Rentals, Inc. After notice, a final hearing was held on July 25, 1995. Mary Amos, the attorney for the Debtor, and John Frawley, the attorney for Action Rentals, Inc., appeared.

In *In re Hobbs*, case No. 95–03259, this matter came before the Court on a *Motion for Relief from Stay* filed on June 26, 1995 by Furniture Plus, Inc. After notice, a final hearing was held on July 25, 1995. Michael Trucks, the attorney for the Debtor, and John Frawley, the attorney for Furniture Plus, Inc., appeared.

In *In re Long*, case No. 95–03588, this matter came before the Court on a *Motion for Relief from Stay* filed on July 19, 1995 by Furniture Plus, Inc. After notice a final hearing was held on August 7, 1995. Rebecca Bozeman, the attorney for the Debtor; John Frawley, the attorney for Furniture Plus, Inc.; and David P. Rogers, Jr., Chapter 13 Standing Trustee, appeared.

## I. Issue, Contentions and Findings of Fact

The debtors and the creditors in the above three cases entered into contracts for the exchange of tangible personal property. There are no facts in dispute in any of the cases and the legal issue in each is identical.[2] That issue is whether a rent-to-own agree-

---

1. A fourth case involving the same issue was pending when these matters were taken under advisement by the Court. That case, *In re Marshall*, case No. 95–02657, was dismissed on October 26, 1995 for an unrelated reason. This Court considers the matter of the rent-to-own agreement in that case to be moot.

2. There are no facts before the Court except for the general ones represented by the contracts entered into by the parties. For the moment, whether there are detailed facts before the Court is of no consequence as the collective purpose of the pending motions is to discover this judge's opinion on the legal identity of rent-to-own agreements.

ment is a lease for rental of property or is a security agreement representing a sale of property. All of the debtors contend that their contracts are secured sales contracts and that they should be allowed to pay their debts through their chapter 13 bankruptcy plans.[3] All of the creditors contend that their contracts are leases and that the debtors may retain the goods only if the debtors comply with the provisions of 11 U.S.C. § 365, provisions that require debtors to cure defaults and assure their creditors that future payments will be made.

◼ Neither position considers that the contracts may be something other than leases or sales agreements but this Court finds as a matter of fact and as a matter of law that the rent-to-own agreements in these three cases are neither "true leases" nor "security agreements" but are, under Alabama law, legislatively created commercial devices designated by the Alabama Legislature as "rent-to-own" agreements, agreements which qualify under the Bankruptcy Code as executory contracts with all rights and requirements of assumption and cure guaranteed to like contracts.[4]

◼ Rent-to-own agreements have some of the characteristics of leases but are not leases. A lease, in terms of tangible personal property, is a contract where the owner of property allows another the use of that property for a specified time in exchange for specific payments, after which the owner has an absolute right to retain the property. Blacks Law Dictionary 889 (6th ed.1990). Rent-to-own agreements allow the use of property for periods of time in exchange for specified payments, but in contrast to common leases, they transfer ownership to the debtor after the specified payments are made. The original owner does not have the right to retain the property if those payments are made in accordance with the agreement.

◼ Rent-to-own agreements have some of the characteristics of sales contracts but are not sales contracts. Retail installment sales contracts creating security interests are sales of goods for a deferred payment price payable in installments. Black's Law Dictionary 1338 (6th ed.1990). Security interests are interests created by contract for the purpose of securing payment of a debt. Black's Law Dictionary 1357 (6th ed.1990). Rent-to-own agreements are contracts that allow for the payment of amounts in installments but they also allow for the termination of the contract before all installments are paid without detrimental consequences to the debtor. In rent-to-own contracts the property being purchased does not secure the debt. The threat of termination of the contract and loss of the use of the property secures the debt.[5]

3. In similar cases debtors argue for sales contracts because a sale and resulting security interest would allow them first to value the property involved, second to bifurcate the claim and third to pay the amount of the value of the property as secured *with interest,* along with the payment of the unsecured portion of the claim *without interest.* This bifurcation could not only allow a debtor to pay a sizeable portion of a debt without interest, it could, in a zero or small percent composition plan where unsecured claims were paid virtually nothing, also allow a debtor to pay only the value of the collateral, a significant reduction in amount in many rent-to-own cases. On the other hand, assuming that rent-to-own agreements are sales contracts, if a debtor does not propose a composition plan, the debtor pays the full amount of the debt with interest as the contract provides. In either case however, if rent-to-own agreements are sales contracts and a debtor fails to complete a chapter 13 plan, whether composition plan or not, the debtor is liable for the full amount remaining on the debt. In contrast, if rent-to-own agreements are executory contracts or leases, a debtor is under no

obligation to pay, other than pre-assumption arrearages, any debt remaining if a chapter 13 plan fails. In this division of this Court most plans are 100% payment plans and debtors rarely request an evaluation of property for the purpose of bifurcating claims; consequently, little benefit would be realized by a debtor in this division in a "sales" type rent-to-own agreement.

4. There may be no significant legal difference in the Bankruptcy Code's treatment of leases and executory contracts. However, there are significant differences in the state law treatment of leases and executory contracts. This Court's ruling eliminates those differences as well as the differences in the Bankruptcy Code's treatment of sales and leases.

5. A third type of related commercial device is a basic rental agreement such as those used for do-it-yourself moving vans. The renter keeps the item only for a short time and returns it to the owner. And although a specific amount is paid, no rights in the property are given even if the

## II. State Law

A rent-to-own agreement is nothing less and nothing more than a hybrid commercial device created by the Alabama Legislature for a distinctive exchange of particular types of property.[6] The clear intent of the Alabama legislature in passing its rent-to-own statute, Code of Ala.1975, § 8–25–1 to § 8–25–6 was to create a commercial device that would allow for the transfer of property from a creditor to a debtor with the eventuality of ownership but that would allow the quick and painless termination of the process at the behest of either.[7] Bankruptcy courts

in the Northern District of Alabama recognize that the current version of Alabama's rent-to-own statute exists in response to the opinion and order issued by the Western Division of this Court in *In re Shelby*, 127 B.R. 682 (Bankr.N.D.Ala.1991), a decision that found rent-to-own agreements to create security interests.[8] There have been amendments to the Alabama statute as well as changes in related laws, however the clear intent of the Alabama Legislature, for better or for worse, has never changed and the clear plain language of the statute remains—rent-to-own agreements do not create security agreements and are not sale contracts.[9]

renter desired such rights. These types of transactions do not provide for transfer of title.

A fourth type of related commercial device includes "car lease" type leases. In those situations if the lessee complies with the term of the contract, ownership is transferred when a final payment is made. This Court considered such leases in *In re Winston*, 181 B.R. 589 (Bankr. N.D.Ala.1995) and held that such leases are not sales agreements but are true leases.

6. Most courts recognize that bankruptcy courts must consider state law in determining whether a particular instrument is a lease or security interest. See *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Unger*, 95 B.R. 761 (Bankr.D.Ore.1989); *In re Morris*, 150 B.R. 446 (Bankr.E.D.Mo.1992); *In re White*, 109 B.R. 768 (Bankr.S.D.Ohio 1989). At least two courts disagree. See *In re KAR*, 180 B.R. 629 (D.Kan.1995); *In re Challa*, 186 B.R. 750 (Bankr.M.D.Fla.1995).

7. One may speculate that when parties enter into such contracts that the intent of the parties at the time the contract is created is not to create a security interest; however, the intervention of bankruptcies causes the continuing debate of whether these contracts are leases or sales contracts with security interests. This in turn results in conflicting court opinions, even in the same district. While this Court agrees with some but disagrees with others, it cannot say that the opinions different from the one this Court holds are not correct. *In re Powers*, 138 B.R. 916 (C.D.Ill. 1992) (lease); *In re Sellers*, Case No. 94–41957–JSS–13, 1994 WL 806097 (Bankr.N.D.Ala. Dec. 19, 1994) (security agreement) (opinion withdrawn on dismissal of case); *In re Allen*, 174 B.R. 293 (Bankr.D.Ore.1994) (lease); *In re Hosea*, Case No. 94–03806–TOM–13 (Bankr. N.D.Ala. Sept. 27, 1994) (lease); *In re Thomas*, Case No. 93–03687–RCF–13 (Bankr.N.D.Ala. Aug. 31, 1993) (lease); *In re Morris*, 150 B.R. 446 (Bankr.E.D.Mo.1992) (executory contract); *In re Goin*, 141 B.R. 730 (Bankr.D.Idaho 1992) (security agreement); *In re Shelby*, 127 B.R. 682 (Bankr.N.D.Ala.1991) (secured transaction); *In*

re *Aguilar*, 101 B.R. 481 (Bankr.W.D.Tex.1989) (installment purchase contract); *In re Burton*, 128 B.R. 807 (Bankr.N.D.Ala.1989) (security agreement), aff'd, 128 B.R. 820 (N.D.Ala.1989); *In re Unger*, 95 B.R. 761 (Bankr.D.Ore.1989) (lease); *In re Mitchell*, 108 B.R. 166 (Bankr. S.D.Ohio 1989) (lease-purchase); *In re White*, 109 B.R. 768 (Bankr.S.D.Ohio 1989) (lease-purchase); *In re Martin*, 64 B.R. 1 (Bankr.S.D.Ga. 1984) (lease).

8. See *In re Hosea*, Case No. 94–03806–TOM–13 (Bankr.N.D.Ala. Sept. 24, 1994) ("Alabama adopted the Alabama Rental Purchase Agreements Act and it was amended in 1991. The amendment was intended to make clear that contracts consistent with the ... Act are to be treated as leases and not as disguised sales.") *Id.* at 2; *In re Sellers*, Case No. 94–41957–JSS–13, 1994 WL 806097 (Bankr.N.D.Ala. Dec. 19, 1994) ("In 1991, the Alabama legislature amended the definition of 'security interest' in response to the *Shelby* decision.") *Id.* at 5 (opinion withdrawn on dismissal of case).

9. A legislature is the voice of its electorate. The intent of that legislature as depicted in its actions, reflects either the view of the majority of that electorate or the collective view of those with the power to affect that intent. But unless that intent creates an irreconcilable conflict between the rights of the electorate and the consequences of the acts of the legislature, this Court need not decide whether those acts are proper. In 1803 Chief Justice John Marshall wrote, "The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest. It seems only necessary to recognize certain principles, supposed to have been long and well established, to decide it." *Marbury v. Madison*, 1 Cr. (5 U.S.) 137, 176, 2 L.Ed. 60 (1803). Prior to the *Marbury* decision, Alexander Hamilton offered:

The interpretation of the laws is the proper and peculiar province of the courts. A Consti-

982

## III. Bankruptcy Law

 Section 365(b)(1) provides:

If there has been a default in an executory contract ... of the debtor, the trustee may not assume such contract ... unless, at the time of assumption of such contract ..., the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract ..., for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract....

11 U.S.C. § 365(b)(1).[10] Once a determination is made that a rent-to-own contract is an executory contract, the issue for this Court is whether a debtor's chapter 13 plan provides the assurances section 365(b)(1) requires. This court must consider each case independently; however, general parameters apply.[11]

## IV. Section 365(b)(1)

 In order to assume a rent-to-own contract, a chapter 13 debtor must provide

adequate assurance of: (1) cure of any default; (2) compensation for pecuniary loss resulting from the default; and, (3) future performance under the contract. Cure of a default in making payments means that a debtor must pay the payment arrearage in full.[12] Compensation for pecuniary loss ordinarily means that a debtor must pay in full any accrued costs of collection provided for by the contract. Future performance under the contract simply means that a debtor must continue to make payments as they become due.

### A. Substantive Assurances

 In order to produce the substantive "adequate assurance" that section 365 requires, a debtor's proposal must contain three basic safeguards. First of all, the debtor must earn sufficient disposable income to allow the payment of the arrearage and other costs within a time period specified, while continuing to make regular plan payments. Second, the debtor must make current contract payments as they become due. Third, the merchant must be given a quick and relatively inexpensive avenue for obtaining relief from the stay if the debtor either defaults on any of the current payments or cure payments. Such relief may be

tution, is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them, to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

*The Federalist* No. 78 (Modern Library ed. 1937), 506.

10. The debtor is, of course, the trustee for purposes of this section's application in a chapter 13 case, and given the fact that this issue is one of first impression for the undersigned, none of these debtors has filed a motion to assume the executory contract. Each of course will be given that opportunity. Although this Court does not believe that there is any question that rent-to-own contracts are executory, if any creditor contends otherwise, that issue would be addressed at any hearing scheduled on a motion to assume.

11. If a debtor chooses to assume an executory contract, the debtor must present the detailed facts necessary for a court to make an informed decision on the request to assume.

12. A debtor with a rent-to-own arrearage would of course be responsible for that debt even if the rent-to-own agreement were determined to be a lease or a sales contract. That is a debt existing regardless of the contract mechanism and the agreements before this Court specifically provide for such. *See* the "rights of termination" clauses. The significant difference in the debt that would be required to be paid if rent-to-own agreements are determined to be sales contracts with security interests, rather than executory contracts or leases, is the deficiency caused by a default occurring after the contract is assumed by the debtor. The opposing debt, or the lack thereof, is a debtor's freedom to return merchandise under the terms of an executory rent-to-own contract without penalty. This can be accomplished simply by a debtor choosing not to renew the contract by choosing not to make future payments.

given in the form of relief from the automatic stay as to future contract and cure payments.[13]

## B. Procedural Assurances

 In order to produce the procedural "adequate assurance" required by section 365, a debtor must propose to pay the arrearage and the pecuniary losses promptly. This Court has held that "prompt," as it relates to curing defaults in residential leases, is six months or the time remaining on the unexpired lease, whichever is less. *In re Morgan*, 181 B.R. 579, 587 (Bankr.N.D.Ala. 1994). That formula presupposes however that a contract, unlike rent-to-own agreements, has a definite term. In "rent-to-own

time" there is no definable term of the agreement or specific end to the contract. Rent-to-own agreements are continued monthly or weekly where the making of payments causes an automatic renewal of the contract through the due date of the next payment.[14] Although rent-to-own agreements end when the debtor pays the full contract "price," there is no "term" from which a court can extract a prompt cure period.[15] What then is a prompt cure period? [16]

 In all three of the cases before this Court the debtors propose to pay their creditors 100% of the debts owed. Confirmation orders were entered in each case

---

**13.** Of course the debtor must also make chapter 13 plan payments when due but the chapter 13 trustee, not the merchant, monitors those payments and has adequate avenues to remedy any default in the making of those payments.

**14.** This Court recognizes that many real estate leases, particularly apartment leases, also operate on a month to month basis. But the difference in these and the rent-to-own monthly agreements is that the real estate leases specifically allow a landlord to terminate the lease on certain notice, regardless of whether a tenant is complying with the terms of the lease. A merchant in a rent-to-own situation does not have the same option. See note 15 below.

**15.** Rent-to-own agreements of course anticipate a certain number of payments for a specific amount of time, thus creating a term of sorts. This term however is directly contradicted by the provisions of the contracts and the Code of Alabama 1975, § 8–25–4 which allow debtors to reinstate agreements where there have been defaults. In addition to other provisions, in some circumstances the right of reinstatement may be extended up to 30 days. Some contracts allow, and a debtor could conceivably add up to three months to the anticipated contract period through this contract proviso alone. In addition, the time added by the filing of a bankruptcy petition would certainly make that period even longer; consequently, the point that a debtor will eventually make all of the payments anticipated will most certainly be beyond the point anticipated by the original contract. In this manner rent-to-own agreements are similar to federally subsidized housing leases. Questions about the treatment of those leases in the bankruptcy context also create situations where courts recognize that "prompt" is determined by the particular circumstances of a case. (*In re Liggins*, 145 B.R. 227 (Bankr.E.D.Va.1992)); (*In re Yokley*, 99 B.R. 394 (Bankr.N.D.Tenn.1989)). One could speculate that these types of leases similarly do not have a definable term from which a court could

extract a prompt cure period as the leases themselves could, as long as a tenant qualifies, be perpetual. In these situations, there is no right of a merchant, or landlord in federally subsidized housing, to terminate a contract or lease as long as the "renter" complies with the agreement. For example, one of the contracts before this Court, in reference to the "renter's" rights reads, "YOUR RIGHT TO TERMINATE: You may terminate this agreement at any time, without further obligation or penalty, by returning the property in its present condition, normal wear and tear excepted, and by paying all rental payments you owe through the date of return." Furniture Plus Rental Agreement with Tommy Hobbs, August 5, 1994. But the same agreement, in reference to the merchant's rights, provides in part, "OUR RIGHT TO TERMINATE: This agreement, at our option, terminates when (a) you fail to make another payment on or before the renewal date, or (b) you breach any terms of this agreement." In contrast, a common real property lease allows either party to terminate the lease at specified times and allows the landlord the option of deciding not to renew the lease when the leases's term expires.

**16.** "The period of time that is considered 'promptly' may vary in accordance with the circumstances on a case by case basis." (*In re the Gold Standard at Penn, Inc.*, 75 B.R. 669, 673 (Bankr.E.D.Penn.1987) (citing *In re Lawrence*, 11 B.R. 44, 45 (Bankr.N.D.Ga.1981))). Three years was prompt in light of a prospective longevity of a successful business operation (*In re Coors of North Mississippi, Inc.*, 27 B.R. 918 (Bankr. N.D.Miss.1983)); cure period of 48 months for a default in a lease of a subsidized apartment was not prompt (*In re Liggins*, 145 B.R. 227 (Bankr. E.D.Va.1992)); cure period of 2 years for a default in a lease with a housing authority was not prompt as compared to expected future relationship (*In re Yokley*, 99 B.R. 394 (Bankr.N.D.Tenn. 1989)).

establishing plans for the debtors to pay those debts within 54 to 60 months. Where promptness cannot be determined in relation to a contract term, promptness may be defined as a portion of the time a debtor proposes to pay other debts and other creditors.[17] In these three cases where the range of time of payment is from 54 to 60 months, a 12 month period to cure a rent-to-own arrearage and to pay pecuniary losses, is most certainly prompt.

■■■■■ If chapter 13 is to provide an effective means for debtors to reorganize, it must provide for the temporary retention by the debtors of personal property to aid in that reorganization. Section 365 was created to fulfill that fundamental requirement. While some items subject to rent-to-own agreements may not be necessary for the ultimate reorganization of a debtor, the opportunity to maintain the status quo, even on a temporary basis, may give a financially troubled debtor the break needed to succeed with a chapter 13 plan. While a debtor may not maintain a "renter's" relationship with a merchant for the entire 12 month cure period, the bankruptcy relationship that exists for this period is necessary for a successful reorganization. To assist in reaching that goal "the code provides a means by which a trustee may continue contracts that will assist in the debtor's rehabilitation of liquidation." *In re Hamilton*, 969 F.2d 1013, 1018 (11th Cir.1992).

## V. Conclusion

Based on the above, it appears to the Court that if a debtor in any of the above three cases chooses to file a motion to assume executory contract and the assumption is allowed, then the motion for relief from stay in that case is due to be denied as to current payments. If a motion to assume executory contract is not filed within 30 days of the date of this order, the motion for relief is due to be granted without further notice or order of this Court. If a motion to assume is filed but denied at a later date, the motion for relief from stay is also due to be granted without condition.[18]

17. Prompt is not defined in the Bankruptcy Code; consequently, a court is not required to define it in terms of expected or common pay periods or in terms of the length of the past or expected relationship of the parties.

18. In *In re Morgan*, 181 B.R. 579 (Bankr. N.D.Ala.1994) this Court formulated a procedure for reconciling prompt cure payments with current "lease" payments and chapter 13 plan payments. The Court wrote:

1. Within ten days of this order, the Debtor will pay to ... the attorney for the Movant, the rent due for August and September, 1994.
2. The Debtor must make all rent payments for the months following September, 1994, in accordance with the terms of the lease.
3. *In addition to* the payments required under the Debtor's Chapter 13 plan which was confirmed by order of this Court dated September 9, 1994, the Debtor shall pay to the Chapter 13 trustee the sum of $112.88 as a "cure payment" on the first day of each month for a period of six months beginning on October 1, 1994. The sum indicated represents one sixth of the total damages of $655.00 incurred by the Movant as a result of the Debtor's default in the terms of the lease, as stipulated between the parties, including rent arrearage, late charges and collections costs, *plus* the Chapter 13 Trustee's percentage fee calculated at the rate of 3.4 per cent. Upon receipt of the funds, the

Chapter 13 trustee shall forthwith distribute the funds as $109.04 to ... the attorney for the Movant, and $3.84 to the Standing Chapter 13 Trustee.
4. In the event the Debtor fails to make the payment required pursuant to the paragraph numbered 1 above, the Movant will be and is hereby granted relief from the stay without further or additional orders of this Court for the purpose of pursuing any remedies available under state law to recover possession of the subject premises.
5.(A) In the event the Debtor fails to make current rent payments and concurrent "cure payments" as required pursuant to the paragraphs numbered 2 and 3 above within ten days of the dates specified for the making of those payments in either the lease instrument or this order, the Movant will be and is hereby granted relief from the stay without further or additional orders of this Court for the purpose of pursuing any remedies available under state law to recover possession of the subject premises.
(B) If the Debtor makes payments to the Chapter 13 Trustee which are less than the total of his plan payments and the "cure payment," the Trustee shall apply the funds received first to the plan payment and the remainder to the "cure payment." This situation will of course create a default for the Debtor and the relief from stay provided for in paragraph 5(A) above will become effective.

It is therefore **ORDERED, ADJUDGED AND DECREED** that:

1. The Motion for Relief from Stay filed in *In re Trusty*, Case No.: 95–01801–BGC–13 is **DENIED** pending the filing of the debtor's motion to assume executory contract;

2. The Motion for Relief from Stay filed in *In re Hobbs*, Case No. 95–03259–BGC–13 is **DENIED** pending the filing of the debtor's motion to assume executory contract; and,

3. The Motion for Relief from Stay filed in *In re Long*, Case No. 95–03588–BGC–13 is **DENIED** pending the filing of the debtor's motion to assume executory contract.

4. If a motion to assume executory contract is not filed in any of the above three cases within 30 days of the date of this order, then the motion for relief from stay in that case is **GRANTED** without further notice or order of this Court. If a motion to assume is filed but denied at a later date, the motion for relief from stay is also due to be granted without condition, but must be done so by additional order of this Court.

5. This order shall be entered as an original proceeding in each of the above three cases.

6. In the event the Debtor's Chapter 13 case is dismissed prior to the Debtor having made all of the payments specified in the paragraph numbered 3 above, the Movant will be and is hereby granted relief from the stay without further or additional orders of this Court for the purpose of pursuing any remedies available under state law to recover possession of the subject premises.

7. The lease between the parties is hereby reinstated and the termination of the lease is hereby declared to be null and void.

8. Any debt owed by the Debtor to the Movant for monetary damages resulting from default in or rejection of the lease shall be determined solely by means of this order or a proof of claim in this bankruptcy proceeding. Unless otherwise modified by order of the bankruptcy court or terminated by operation of law, the stay shall remain in effect to preclude the adjudication or collection of any such debt outside of this bankruptcy proceeding.