In re Mary E. STELLMAN, Debtor,

Bankruptcy No. 99–00451.

United States Bankruptcy Court,
D. Idaho.

Aug. 11, 1999.

Richard L. Alban, Nampa, ID, for debtor.

Jerry W. Korn, Caldwell, ID, for Central Rent–To–Own, Inc.

John H. Krommenhoek, Boise, ID, Chapter 13 Trustee.

## MEMORANDUM OF DECISION AND ORDER

TERRY L. MYERS, Bankruptcy Judge.

This chapter 13 case presents issues regarding the treatment, under the Bank-

ruptcy Code and applicable non-bankruptcy law, of consumer "rent-to-own" contracts.

## BACKGROUND

Mary Stellman ("Debtor") filed her voluntary chapter 13 petition for relief on March 2, 1999. Prior to filing, Debtor entered into several "Rental Purchase Agreements" with Creditor Central Rent–To–Own ("Central"). Those rental purchase agreements can be summarized as follows:

| Date | Contract No. | Property Description | Length [1] | Monthly Payment Amounts [2] |
|---|---|---|---|---|
| 05/13/98 | 12052 | Television | 18 mo. | $166.95 |
| 07/06/98 | 12262 | Bedmates, 4 drawer chest | 15 mo. | 65.10 |
| 12/19/98 | 12991 | Queen Bed | 17.93 mo. | 78.75 |
| 12/19/98 | 19838 | Headboard, footboard | 17.93 mo. | 30.45 |
| 12/19/98 | 12990 | Four drawer chest | 17.93 mo. | 22.20 |

Debtor's proposed chapter 13 plan deals with Central as a secured creditor with collateral consisting of "furniture." Debtor asserts that the allowed secured value of this property is $2,400.00 and proposes to pay that amount, under § 1325(a)(5)(B), over 36 months at 9% interest. Central objected to this treatment, insisting that its Rental Purchase Agreements were leases which must be dealt with under § 365 of the Code. That issue was taken under advisement.

The parties have briefed the matter and the Court has evaluated those submissions as well as other authorities. This decision constitutes the Court's findings of fact and conclusions of law on this contested matter.

1. Each of the agreements identifies the "term" of the lease as one month at a given monthly rental amount or, alternatively, one week with a different weekly rental amount. The agreements also identify the total number of months (or equivalent number of weeks) in the event the consumer wishes to complete purchase of the property leased. Each payment automatically renews the lease for the "term" represented by that payment. ("At your option, you may renew this lease by making a rental payment in advance for each term you choose to rent the property." Agreement, p. 1).

2. If fully performed, Debtor would pay $3,005.10 for the television, $976.50 for the bedmates and chest, $1,411.99 for the queen bed, $545.97 for the headboard and footboard, and $414.18 for the 4–drawer chest. Paying weekly instead of monthly increases

## DISCUSSION

### 1. *In re Goin* and the characteristics of "rent-to-own" contracts

This Court last dealt with "rent-to-own" contracts in *In re Goin*, 141 B.R. 730, 92 I.B.C.R. 108 (Bankr.D.Idaho 1992). In that case, Bankruptcy Judge Alfred C. Hagan concluded under Idaho case law [3] that agreements substantially similar to those involved in the instant case were sales contracts with retained security interests [4] rather than true leases. Several factors led the Court to this conclusion: the lessees bore the risk of loss through damage or destruction of the property; a portion of each payment was designated for sales tax; if the lessees purchased under the

the total cost. These figures do not include any late fees or like charges. The parties haven't provided the reverse side of these preprinted form agreements which, from the Court's experience in other cases, would disclose the actual "cash value" of the items, and enable counsel and the Court to calculate effective interest rates for a "financed purchase."

3. *See also* Idaho Code § 28–1–201(37) (setting forth standards for determining whether an agreement is a true lease or creates a security interest).

4. If the agreements create security interests, several other issues are implicated, e.g., whether or not the creditor is perfected and, if so, what treatment must be afforded such a creditor under §§ 506, 1325(a)(5), or other potentially relevant provisions of the Code.

option, they received coverage under any factory warranty; and the lessees became the owner of the property at the conclusion of the agreement without payment of any residual or other amount. 141 B.R. at 731, 92 I.B.C.R. at 109.

The agreements here are similar in all those regards. The risk of loss is on the lessee. Payments include a sales tax component. If the lessee makes all the scheduled payments, he or she will own the property without payment of any other "residual" amount. If the property is purchased, the manufacturer's warranty (if still in effect) is given to the lessee. The lessee may also purchase at any time prior to the last month by paying 60% of the remaining total cost.

Cutting against the Court's conclusion in *Goin*, the Rental Purchase Agreement forms used by Central here provide that the lessor shall maintain the property in working order so long as it's rented. They also provide that the lessee may terminate the agreement without penalty by voluntarily surrendering or returning the property in good repair at the end of any lease term along with any past due rental payments. The agreements forbid the lessee from selling, mortgaging, pawning, pledging, encumbering or otherwise disposing of the property absent purchase. The form in several places emphasizes that it is a "rental transaction."

In addition to the foregoing, gleaned from the documents, the parties have stipulated that Central pays any required personal property tax, though the debtor pays sales tax. They further agree that, in prior transactions, Debtor has in some circumstances purchased the rented property and in other situations returned the property under the termination provisions. They stipulate that Debtor would here testify that it was her intention to purchase all the items under the five subject agreements.

The parties in this litigation (and in several other pending cases) have argued at length over whether this current, common version of a rent-to-own agreement is a "true lease" or a credit sales agreement with a retained security interest in light of § 28–1–201(37) and the analysis in *Goin*.

■ While this Court is charged with interpreting and applying the nation's bankruptcy laws, it must necessarily defer to state law in identifying the interests of the parties. *Goin*, 141 B.R. at 731, 92 I.B.C.R. at 109 (citing *Arnold Machinery Company v. Trustee Services Corporation (In re Hodge Lumber & Wholesale, Inc.)*, 86 I.B.C.R. 28 (Bankr.D.Idaho 1986)); *see also, Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Accordingly, the Court must review other developments in the applicable state law since *Goin* was decided in 1992.

**2. The Idaho Lease–Purchase Agreement Act**

■ In 1993, the Idaho Legislature enacted the "Idaho Lease–Purchase Agreement Act." Idaho Code § 28–36–101, *et seq.* [as added by 1993 Idaho Sess. Laws, ch. 232, § 1, p. 807] (hereafter the "Act").[5] The Act provides in part:

> **28–36–101. Short title and purpose.**—This act shall be known and may be cited as the "Idaho Lease–Purchase

---

**5.** This enactment was but one example of state legislative reactions to issues involving consumer rent-to-own contracts. *See, e.g.,* " 'Rent–To–Own' Agreements in Bankruptcy: Sales or Leases," 2 Am.Bankr.Inst.L.Rev. 115, at 124, 134–36 (Spring 1994). This article promoted the position that rent-to-own contracts are "true leases" and it opposed a then-pending ALI–ABA proposal that would treat such contracts as "credit sales for all purposes in bankruptcy." *Id.* at 117, 137–44.

The authors' perspective was disclosed: one was staff attorney for the corporation which owned and operated the nation's largest rent-to-own company, and the other two were members of a firm which represented that company. *Id.* at 115. A more current, and comprehensive discussion can be found in "Consumer Advocates vs. The Rent–To–Own Industry: Reaching a Reasonable Accommodation," 34 Am.Bus.L.J. 385 (Spring, 1997).

Agreement Act." The purpose of this act is to protect both consumers and businesses engaged in the lease-purchase of consumer goods against unfair or deceptive acts and practices, to provide certainty and regularity in the conduct of these transactions, and to provide efficient and economical procedures to secure such protection.

**28–36–102. Definitions.**—As used in this chapter:

. . .

(5) "Lease-purchase agreement" means an agreement by a lessor and a consumer for the use of personal property by a consumer primarily for personal, family or household purposes, for an initial period of four (4) months or less that is automatically renewable with each payment after the initial period, but does not obligate or require the consumer to continue leasing or using the property beyond the initial period, and. that permits the consumer to become the owner of the property.

. . .

**28–36–103. Inapplicability of other laws—Exempted transaction**—(1) Lease-purchase agreements are not governed by the laws relating to:

. . .

(b) A regulated consumer credit transaction pursuant to section 28–41–101, *et seq.*, Idaho Code; or

(c) A security interest as defined in section 28–1–201, Idaho Code. . . .

Pursuant to the Act, the Idaho Legislature has decreed that a lease-purchase agreement is not governed by the laws relating to security interests. § 28–36–103(1)(c). While it might have been preferable if the Legislature had also amended § 28–1–201(37) (or perhaps § 28–9–104) at the same time the Act was passed in order to make clear the exclusion of lease-purchase agreements from the reach of U.C.C. Article 9, it is nevertheless the conclusion of this Court that lease-purchase agreements in Idaho qualifying under § 28–36–102(5) are no longer subject to the "true lease" versus "disguised credit sale" debate which flows under § 28–1–201(37) and related case law.

Several other bankruptcy courts faced with similar state legislation have come to this same conclusion. *See, In re Street,* 214 B.R. 779 (Bankr.W.D.Pa.1997); *In re Rigg,* 198 B.R. 681 (Bankr.N.D.Tex.1996); *In re Trusty,* 189 B.R. 977, 981 (Bankr. N.D.Ala.1995); *In re Connelly,* 168 B.R. 714 (Bankr.W.D.Wash.1993); *Rent–A–Center, Inc. v. Mahoney (In re Mahoney),* 153 B.R. 174 (E.D.Mich.1992); *In re Morris,* 150 B.R. 446 (Bankr.E.D.Mo.1992); *see also, In re Powers,* 983 F.2d 88 (7th Cir.1993).

Admittedly, some bankruptcy · courts which sit in districts where state law includes lease-purchase agreement acts have found that the statute is not determinative of the legal identity of rent-to-own contracts. *See, e.g., In re Barnhill,* 189 B.R. 611 (Bankr.D.S.C.1992). As noted by that court, however, South Carolina's statute can be distinguished from other such lease-purchase statutes since South Carolina's legislature did not specifically "displace" the use of that state's version of U.C.C. § 1–201(37) when dealing with lease-purchase agreements. 189 B.R. at 615. The Idaho Legislature, on the other hand, has in § 28–36–103(1)(c) specifically eliminated the application of Article 9 with regard to rent-to-own contracts.

This does not mean that Idaho's Lease–Purchase Agreement Act impliedly repeals § 28–1–201(37). Courts are cautioned against finding repeal of U.C.C. provisions by implication. § 28–1–104. And it appears the provisions of the two statutes may be harmonized. Section 28–36–103(c) states that the laws relating to security intents as defined in § 28–1–201 do not apply to lease-purchase agreements, but it does not purport to repeal § 28–1–201(37). It only makes it inapplicable to certain

contracts.[6] Read together, the provisions are not irreconcilably in conflict.

Does this mean that a lease-purchase agreement is a "true lease"? The answer appears to be no. The lease-purchase agreement does not have all the traits traditionally required for a finding of a true lease. *Goin,* 141 B.R. at 731, 92 I.B.C.R. at 109.[7]

But the Act seems to make the question of "true lease" irrelevant: if the agreement is a "lease-purchase agreement," it need be nothing more or less. That creature of consumer financing is now recognized by and defined in § 28–36–102(5). In the present matter, Central's rent-to-own agreements fall within the scope of the Act. They are contracts for the use of personal property by an individual for household purposes, for an initial period of four months or less, and they are renewable after the initial period. Further, they permit the lessee to become owner of the property but, importantly, they do not obligate the lessee to become the owner, and the lessee retains the right to terminate.

Debtor argues that recognizing the agreements as falling within the Act and the Act as eliminating the § 28–1–201(37) issue would generate an unfair result, because she will pay an excessive amount either in completing performance of these costly financing contracts and purchasing the goods, or in terminating the agreements and replacing the goods. Either

approach, according to Debtor, injures her and also unsecured creditors who would be denied distributions to the extent funds are so devoted. Debtor thus urges the Court to judicially extend *Goin* to the instant agreements notwithstanding the Act, and allow her to cramdown Central's claims as if these were financed purchases subject to Article 9.

Debtor here stops short of the contention advanced by some that rent-to-own contracts are more than just economically onerous, and are so abusive of consumers that they should be found to be unconscionable and unenforceable. But she starts from the same premise: that such agreements are rarely used for reasons other than financing purchase of the goods; that the consumer lessees are not adequately informed of the terms of the agreements, or of how they compare to other financing alternatives; that rent-to-own creditors charge effective interest rates well beyond the norm, ranging from 100% to 200% per annum,[8] without Truth In Lending and other disclosures generally required of regulated consumer credit transactions;[9] and that these creditors deal with consumers who lack meaningful choice in obtaining financing and have grossly unequal bargaining power.[10]

Regardless of the extent of the Court's sympathy to any of these arguments, the Idaho Legislature has recognized lease-purchase agreements as legitimate con-

---

**6.** Similarly, § 28–9–102(2) provides that Article 9 doesn't apply to statutory liens except in limited circumstances, and § 28–9–104 excludes several other transactions from Article 9. There is no apparent reason to recognize only exclusions announced in chapter 9 of Title 28, and not the exclusion announced in chapter 36 of Title 28.

**7.** But see, *Street,* 214 B.R. at 782 (a right to terminate before purchase makes agreement a "true lease"); *Powers,* 983 F.2d at 90–1 (same); Cf., *Barnhill,* 189 B.R. at 615–16 (noting split among courts as to whether or not such agreements are true leases solely because of the lessee's right to terminate, and identifying at least four courts rejecting this "one factor test".)

**8.** Based upon the assumption that the lessee performs the entire lease and purchases the property.

**9.** *See, e.g.,* § 28–36–103(1)(b).

**10.** Debtor's place in the consumer credit queue is, in addition to these several rent-to-own transactions, also reflected by claims filed in this case, which reflect that Debtor incurred a 4 month, $200.00 loan at a disclosed interest rate of 132.96% per annum, and a "payday" loan which cost at least $41.00 for a two-week $200.00 advance. Her schedule F reflects two other creditors with apparently similar claims.

sumer contracts and declared that they are enforceable, provided certain disclosures [11] are made. The Act also prohibits certain provisions and practices,[12] places limits on renegotiations and advertising,[13] and provides remedies for enforcement in actions against creditors who violate the Act to the damage of a consumer.[14]

In light of such seemingly comprehensive treatment of the subject by the Idaho Legislature, and upon the record developed in this litigation, the Court will decline the invitation to evaluate the equities, rough or otherwise, in this niche of consumer finance, and will not hold that such agreements are *per se* unconscionable and unenforceable, or so unfair in genesis or impact that they must be judicially modified. The extant record is insufficient to persuade the Court that such relief is proper, or is something other than a request to judicially legislate.

### 3. Treatment of the lease-purchase agreements under the plan

 If Central's "Rental Purchase Agreements" are not secured transactions subject to treatment in this chapter 13 case under § 1325(a)(5), how are they to be handled?

Central contends that Debtor must "accept or reject" the transactions as a lease under § 365. A debtor may, under § 1322(b)(7) and subject to § 365, provide for the assumption, rejection or assignment of any executory contract or unexpired lease [15] of the debtor not previously rejected. This District's model chapter 13 plan recognizes the same. Thus a debtor may propose in a chapter 13 plan to assume a rent-to-own agreement as an executory contract.[16] Debtor has the right to affirm or disaffirm Central's contracts.

If assumed, the relative advantages and disadvantages of these agreements under state law are perpetuated. Debtor continues to have the right of possession, and ultimate purchase (if that option makes economic sense given the remaining term of the agreements when the petition was filed) so long as the payments are made. If the "effective" interest rate or any other aspect of the rent-to-own agreement is offensive to her, Debtor has the right—both under the Code and the agreements—to terminate the lease purchase. In the final analysis, it is this right to terminate and extract oneself from the disadvantages of the rent-to-own contract that protects a debtor in bankruptcy.

## CONCLUSION

Inasmuch as the Court has concluded Central's objection to Debtor's proposed plan treatment of the lease-purchase agreements is well taken under the 1993 amendments to the Idaho Code, confirmation of the existing plan must be and is DENIED. Debtor shall have twenty (20) days from the date hereof to amend her plan and notice the same for continued confirmation hearing.

---

11. Idaho Code §§ 28–36–104, 28–36–105.

12. Idaho Code § 28–36–106.

13. Idaho Code §§ 28–36–109, 28–36–110.

14. Idaho Code § 28–36–111.

15. Even if not "true leases", the agreements are sufficiently executory to fall within § 365. *See, In re Young,* 97.4 I.B.C.R. 123, 124 (Bankr.D.Idaho 1997) (applying the "Countryman definition"). *See also, Trusty,* 189 B.R. at 982–3.

16. Section 134 of H.R. 833, The Bankruptcy Reform Act of 1999 as passed earlier this year by the House, would provide additional procedures for such assumption of personal property leases by individual debtors, and clarifies that it is the debtor, not the estate, that assumes the liability under such agreements.